# EXHIBIT 1
# (Complaint)

EXHIBIT 1

Case 2:19-cv-05694-PA-AFM Document 1-2 Filed 06/30/19 Page 2 of 61 Page ID #:9
Electronically FILED by Superior Court of California, County of Los Angeles on 06/12/2019 03:32 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clinton, Deputy Clerk
19STCV20438

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Dennis Landin

Alexander S. Gareeb, Esq., State Bar No.: 207473
Ronald Minassian, Esq., State Bar No.: 319028
**GAREEB LAW GROUP APC**
5900 Canoga Avenue · Suite 250
Woodland Hills · California · 91367
Telephone No.:  818 · 456·0970
Facsimile No.:  818 · 456·0980

Email: AGareeb@GLGLegal.com
Email: RMinassian@GLGLegal.com

Attorneys for Plaintiffs
PETER SELTZER, ALEXANDER S. GAREEB, and BASHIR HAJJAR

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| PETER SELTZER, an individual, ALEXANDER S. GAREEB, an individual, and BASHIR HAJJAR, an individual,<br><br>               Plaintiffs,<br><br>   vs.<br><br>ACC ENTERPRISES LLC, a Nevada Limited Liability Company; HOWARD MISLE, an individual; STEVE RADUSCH, an individual; MEGHAN KONECNE, an individual; JOHN LUCCHINO, an individual; INNOVATIVE REAL ESTATE HOLDINGS, LLC, a Delaware Limited Liability Company; AMERICAN METAL RECYCLING SERVICES, INC., a California corporation; AMERICAN METAL RECYCLING SERVICES OF NEVADA, INC., a Nevada corporation; CALVADA PARTNERS LLC., a Nevada Limited Liability Company; NEVADA REAL ESTATE HOLDINGS, LLC, a Nevada Limited Liability Company; and RECYCLING SPECIALIST, INC., a California corporation; and DOES 1 through 100,<br><br>               Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |

Plaintiffs PETER SELTZER, ALEXANDER S. GAREEB, and BASHIR HAJJAR (collectively "Plaintiffs") allege individual claims and, as shareholders, derivative claims on behalf of Defendants ACCENTERPRISES, LLC, HOWARD MISLE, STEVE RADUSCH, MEGHAN KONECNE, JOHN LUCCHINO, INNOVATIVE REAL ESTATE HOLDINGS, LLC, AMERICAN METAL RECYCLING SERVICES, INC., AMERICAN METAL RECYCLING

-1-

SERVICES OF NEVADA, INC., CALVADA PARTNERS LLC, NEVADA REAL ESTATE HOLDINGS, LLC, and RECYCLING SPECIALIST, INC., and DOES 1 through 100 (collectively "Defendants"), and allege as follows:

**GENERAL ALLEGATIONS**

**<u>SUMMARY</u>**

1.      Defendants are now, and at all relevant times were, fiduciaries who owed fiduciary duties to fellow ACC shareholders and to ACC itself. Defendants ignored those duties, and, especially, ignored their duty of loyalty.

2.      This case involves nothing less than flagrant and criminal looting of corporate assets, illegal asset stripping, self-dealing, usurping of corporate opportunities, violations of fiduciary duties, gross mismanagement, corporate waste, oppression of minority shareholders, disregard of actual conflicts of interest, and violations of basic corporate governance requirements. In addition, Plaintiffs are informed and believe and thereon allege that Defendants are engaging in other criminal activity, such as tax evasion and money laundering.

3.      Among other things, Defendants abused their fiduciary positions by the following:

        a.      Usurping Corporate Assets and other Improper Appropriation of Investor Proceeds;

        b.      Misappropriation of ACC Assets;

        c.      Defendants Illegally Diverted to Themselves Sales of Corporate Opportunities Which In Turn Rendered the Company Cash-Starved

        d.      Profiting from ACC's Cash Starvation;

        e.      Elimination of All Oversight;

        f.      Domination of Management to the Detriment of Shareholders/Members;

        g.      Misleading Directors, Officers, and Shareholders/Members;

        h.      Disloyalty;

        i.      Improper/Illegal Management Practices that Place at Risk ACC Valuable Assets Including Licenses;

        j.      Failure to Provide Shareholders Information, Accurate or Otherwise;

-2-

1                k.      Defendants Deprived ACC of the Opportunities to Acquire Desperately

2 Needed Additional Working Capital;

3                l.      Defendants Treated Shareholders Unfairly;

4                m.      Embezzlement;

5                n.      Money Laundering;

6                o.      Misrepresentation;

7                p.      Violations and/or Non-Compliance with the Requirements under the Nevada

8 Department of Taxation, Among Others; and/or

9                q.      Tax Evasion;

10      4.      Plaintiffs allege direct, (or individual) claims, and derivative claims on behalf of

11 ACC, including claims under the Racketeer-Influenced and Corrupt Organizations Act ("RICO").

12      5.      Plaintiffs are informed and believe and thereon allege that Defendants have an

13 extensive record of similar conduct, and that they have invested in other companies which end up

14 out of business after Defendants take out assets and take for themselves as much of the companies'

15 stock and/or assets as possible.

16      6.      Upon information and belief, Defendants are now marshaling, disposing and/or

17 transferring ACC's key assets without sufficient consideration, favoring themselves in every way

18 possible and are effectively dissolving ACC in their own ad hoc way to maximize the advantage of

19 such dissolution for themselves and which has severely damaged ACC, its other shareholders and

20 its creditors.

21                                    **JURISDICTION AND VENUE**

22      7.      This Court has jurisdiction over all causes of action asserted herein based on subject

23 matter jurisdiction over the civil RICO claims. 18 U.S.C. Section 1964 (1994); 28 U.S.C. Section

24 1331 (1994); *see also, Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1194-1195 (9th Cir. 1988)

25 (noting that federal courts have concurrent jurisdiction over RICO claims and pendent jurisdiction

26 over state claims joined with RICO claims).

27      8.      This Court has jurisdiction over each Defendant named herein because each

28 Defendant conducts business in and/or maintains operations in this District, and/or conducted at

1   least one stock sale from California and/or to a California resident and/or owns real property in

2   California or has sufficient minimum contacts with California so as to render the exercise of

3   jurisdiction permissible under traditional notions of fair play and substantial justice.

4       9.      This case may be instituted in this district because at least one Defendant resides, is

5   found, has an agent, and/or transacts his affairs in this District.

6       10.     This derivative action is brought pursuant to Section 800 of the California

7   Corporations Code to remedy Defendants' violations of law.

8       11.     Venue is proper in this Court because one or more of the Defendants either resides in

9   or maintains offices in this District and/or a substantial portion of the transactions and wrongs

10  complained of herein, including Defendants' primary participation in the wrongful acts detailed

11  herein, occurred in this District, and Defendants have received substantial compensation in this

12  District by doing business here and engaging innumerous activities that had an effect in this

13  District.

14                              **PARTIES**

15      12.     ACC is the nominal defendant on whose behalf Plaintiffs are asserting claims.

16      13.     Plaintiffs are informed and believes that ACC is a Nevada limited liability

17  company and had been a legitimate, privately owned company.  ACC has engaged in substantial

18  business operations in California, has solicited investments from California residents, and has

19  received assets and funds from California businesses, including from ACG, a business located in

20  California. ACC is substantially owned and/or solely controlled by Defendant HOWARD

21  MISLE.

22      14.     Plaintiffs are informed and believes that ACC had obtained a license to cultivate

23  cannabis from the state of Nevada in November 2014, and has purportedly raised over $20

24  million from investors and note holders, yet there have been no distributions to investors and note

25  holders, much less any information as to the operations of ACC.

26      15.     Remarkably, the investors, despite repeated requests, have never been provided

27  any information as to precisely how much money has been raised for ACC or how those funds

28  have been spent.

16.     Plaintiffs are now, and at all relevant times have been, owners of shares in ACC.

17.     Defendant HOWARD MISLE ("MISLE") is, and at all relevant times was, a de facto resident of the County of Los Angeles despite his feigned legal position, for income tax purposes, that he is a resident of Nevada.

a.     MISLE claims to be one of the most successful businessmen in the metal recycling industry, as well as one of the most experienced and innovative cannabis cultivators in the nation with "extensive expertise in all aspects of the cannabis industry, including all levels of cultivation, production, and sales".  He also claims to be in the music business and successful real estate investor.  His net worth exceeds $50 million, despite his representations in debtor examinations that he is insolvent.[1]

b.     MISLE is, and at all relevant times has been, the Co-Manager, Officer, and Controlling Shareholder of ACC, and has solely controlled the operations and financials of ACC. Also, MISLE is a shareholder of ACC, though he invested no money, and certainly not any substantial investment that would justify proper consideration.

c.     In either capacity, *i.e.*, as Co-Manager, Officer, and Controlling Shareholder of ACC, MISLE has, and has had, fiduciary duties to ACC and to its shareholders, including without limitation, a duty of loyalty, a duty of full disclosure, a duty of fair dealing and a duty not to compete with ACC. ACC was willing to do business with MISLE based on representations by MISLE.

d.     MISLE has eliminated all oversight of ACC's management of ACC. MISLE is not accountable to anyone for decisions concerning ACC.  MISLE has refused to hold annual shareholder meetings in violation of the company's Operating Agreement.  MISLE has refused to appoint a proper board of directors in violation of the company's Operating Agreement and contradictory to the advice of the company's general counsel. There is no audit committee of

---

[1] Indeed, MISLE has at least four (4) judgments against him, amounting to more than $5 million in judgments. MISLE was also found guilty of workers' compensation fraud in 2007.  In addition to the judgments and fraud judgment against MISLE, MISLE was forced into involuntary bankruptcy, and is currently a key figure in a shareholder derivative lawsuit pending in Los Angeles based on very similar allegations as herein, as well as, upon information and belief, further lawsuits by other shareholders in other MISLE ventures (*i.e.*, GENESIS MEDIA, LLC and/or GENESIS DEVELOPERS, LLC), wherein the allegations are strikingly similar as the pending shareholder derivative in Los Angeles, as well as the instant lawsuit.

1   ACC's Board of Directors or any other normal and customary committee to perform oversight of

2   management and the company to the benefit of shareholders.

3               e.      MISLE has refused to answer shareholder questions and provide timely and

4   accurate documents, including financial documents at shareholder's requests for such

5   information.   Indeed, MISLE and Defendant STEVE RADUSCH have admitted that the

6   company's books and financial records are in disarray and inaccurate despite their duty to ensure

7   that such is not the case.

8               f.      MISLE has steadfastly refused to provide shareholders of requested and

9   required information.   MISLE has threatened shareholders who continue to persist in their

10   requests for company information and that MISLE act in the proper and required manner as an

11   officer and manager of the company.

12               g.      MISLE was also able to fundamentally change ACC's management,

13   replacing competent, experienced officers and directors with incompetent affiliates who were

14   loyal to MISLE.   Qualified officers were removed or quit and were replaced by MISLE. The

15   replacements lack sufficient credentials for their positions and their continued employment

16   requires obedience to MISLE.

17               h.      MISLE caused persons to be placed on ACC's payroll (or reimbursed for

18   non-company expenses), not for legitimate ACC business purposes; but in order to oversee ACC's

19   operations, report to MISLE, effectuate MISLE's directives and perform non-ACC business on

20   ACC's company time.   These persons included without limitation, Defendants MEGHAN

21   KONECNE and STEVE RADUSCH.

22       18.     Plaintiffs are informed and believes that Defendant STEVE RADUSCH

23   ("RADUSCH") is now, and was at the time of the filing of this Complaint and at all intervening

24   times, an individual residing in Clark County, Nevada.

25               a.      RADUSCH is an improperly qualified and vetted person appointed by

26   MISLE to be Chief Financial Officer without any other shareholder or Board of Directors

27   oversight or input even though RADUSCH had previously been terminated and sued in other

28   companies for incompetence and misuse of company funds.

-6-

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

b.      Moreover, RADUSCH did not discharge his fiduciary duties to the shareholders by not providing them the information shareholders are legally entitled to have despite numerous requests to do so.  Indeed, in an act of self-dealing and clear example of his failure to act in a responsible and objective manner, MISLE used his sister to provide RADUSCH to the company and then used $10,000 in company funds to pay his sister.

c.      RADUSCH further misinformed shareholders regarding the financial status of ACC, as well as extremely important information pertaining to a purported take over.

d.      Plaintiffs are informed and believe that, at various times relevant to this Complaint, RADUSCH is or was an officer, a director, and presumably a shareholder of ACC. Indeed, it is indicative of the failure of MISLE and RADUSCH to provide important information such that the shareholders of the company are not aware of RADUSCH's actual status/position in the company, his actual level of authority, his compensation, or whether or not he is a shareholder himself or has options as to becoming a shareholder.

19.      MISLE and RADUSCH had steadfastly refused to disclose that information. ACC continues to find other sources of capital, yet the investors are in the dark as to what this means and how it affects their ownership positions. ACC management has refused to provide requested information such as financial information, operational information, etc., to investors, and, what little information that investors have received, has been inaccurate and/or irrelevant as to what was requested.  ACC management has refused to allow investors the opportunity to review books and records.

20.      MISLE and RADUSCH (shareholders believe as to RADUSCH) were at all times relevant hereto "control" persons of ACC, as that term is defined in California Corporations Code section 160(a). Pursuant to section 160(a), "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a corporation.

21.      Plaintiffs are informed and believe that Defendant MEGHAN KONECNE is now, and was at the time of the filing of this Complaint and at all intervening times, an individual residing in 11 Qunitessa Circle, Las Vegas, Clark County, Nevada, 89141.

a.      KONECNE is MISLE's wife who received significant improper financial

benefits, though she never provided any services, much less even went to the ACC facility. Furthermore, significant ACC funds were suspiciously wired into KONECNE's personal account from an ACC account controlled by MISLE.

22.     Plaintiffs are informed and believe that Defendant JOHN LUCCHINO ("LUCCHINO") is now, and was at the time of the filing of this Complaint and at all intervening times, an individual residing in 543 Idalia Court, Fort Collins, Larimer County, Colorado, 805255.

      a.     LUCCHINO is MISLE's lifelong best friend, who is also a licensed broker-dealer. LUCCHINO was a frequent visitor to ACC in Pahrump, Nevada, and was in full knowledge at all times as to management and ACC's assets.

      b.     LUCCHINO fraudulently served as MISLE's proxy as manager in a newly formed Delaware company, Defendant INNOVATIVE REAL ESTATE HOLDINGS, LLC, to sell certain assets of ACC and ACC's managers, without the authorization, much less knowledge of all owners.

23.     Plaintiffs are informed and believe that Defendant INNOVATIVE REAL ESTATE HOLDINGS, LLC ("INNOVATIVE") is now, and was at the time of the filing of this Complaint and at all intervening times, a Delaware Limited Liability Company, with its principal place of business as 8 the Green, Su A, Dover, Kent County, Delaware, 19901, though, upon information and belief, INNOVATIVE has engaged in substantial business operations in California, and has received assets and funds from California businesses, including from ACC. Plaintiffs are informed and believe that INNOVATIVE is substantially owned and/or controlled by MISLE, and that INNOVATIVE was used as a vehicle to embezzle and/or launder investor money

24.     Plaintiffs are informed and believe that Defendant AMERICAN METAL RECYCLING SERVICES, INC. ("AMRS") is or has been a California corporation. Plaintiffs are informed and believe that AMRS has engaged in substantial business operations in California. Plaintiffs are further informed and believes that AMRS maintains or maintained a principal place of business in San Jose, California, and has received assets and funds from California businesses, including from ACC. Plaintiffs are informed and believe that AMRS is substantially owned

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

and/or controlled by MISLE, and that AMRS was used as a vehicle to embezzle and/or launder investor money.

25.    Plaintiffs are informed and believe that Defendant AMERICAN METAL RECYCLING SERVICES OF NEVADA ("AMRSN") is or has been a Nevada corporation. Plaintiffs are informed and believe that AMRS has engaged in substantial business operations in California and Nevada, and has received assets and funds from California businesses, including from ACC.  Plaintiffs are informed and believe that AMRSN is substantially owned and/or controlled by MISLE, and that AMRSN was used as a vehicle to embezzle and/or launder investor money.

26.    Plaintiffs are informed and believe that Defendant CALVADA PARTNERS, LLC ("CALVADA") is or has been a Nevada limited liability company and has its principal place of business in Las Vegas, Nevada.  Plaintiffs are informed and believe that the principal place of business for CALVADA is 300 S. 4th Street, Las Vegas, Clark County, Nevada, 89101, though, upon information and belief, CALVADA has engaged in substantial business operations in California, and has received assets and funds from California businesses, including from ACC. Plaintiffs are informed and believe that CALVADA is substantially owned and/or controlled by MISLE, and that CALVADA was used as a vehicle to embezzle and/or launder investor money.

27.    Plaintiffs are informed and believe that Defendant NEVADA REAL ESTATE HOLDINGS, LLC ("NREH") is or has been a Nevada limited liability company, and has its principal place of business in Las Vegas, Nevada.   Plaintiffs are further informed and believe that NREH has engaged in substantial business operations in California, and has received assets and funds from California businesses, including from ACC. Plaintiffs are informed and believe that RSI is substantially owned and/or controlled by MISLE, and that RSI was used as a vehicle to embezzle and/or launder investor money.

28.    Plaintiffs are informed and believe that Defendant RECYCLING SPECIALIST, INC. ("RSI") is or has been a California corporation, has engaged in substantial business operations in California, and maintains or maintained a principal place of business in California. Plaintiffs are informed and believe that RSI has received assets and funds from California

businesses, including from ACC.  Plaintiffs are informed and believe that RSI is substantially owned and/or controlled by MISLE, and that RSI was used as a vehicle to embezzle and/or launder investor money.

29.     Defendants, including DOES 1 through 100, were assisted in the conduct alleged herein by various other persons. Their names and capacities are unknown to Plaintiffs at this time. When their true names and capacities are ascertained, Plaintiffs may seek leave to amend this Complaint. Plaintiffs are informed and believe, and based thereon allege that each of the unnamed parties is responsible in some manner for the occurrences alleged, and that ACC's damages were proximately caused by Defendants and the unnamed parties, jointly, severally, and concurrently.

30.     DOES 1 through 100 are persons, corporations, partnerships, or other entities who have done or will do acts otherwise alleged in this Complaint. Plaintiffs are informed and believe, and on such information and belief allege, that Defendants identified as DOES 1 through 100 inclusive, at all times mentioned herein, have acted and are continuing to act in concert with Defendants named herein, and that each of them has participated in the acts and transactions which are the subjects of this Complaint.

31.     The true names and capacities of DOES 1 through 100, whether individual, corporate, or otherwise, are unknown to Plaintiffs, who therefore sue such Defendants under such fictitious names, pursuant to the provisions of California Code of Civil Procedure section 474. Plaintiffs will request leave of court to amend the Complaint to allege the true names and capacities of such Defendants as such time as the same have been ascertained.

32.     Plaintiffs are informed and believes and thereon alleges that at all times mentioned herein that Defendants, and each of them, were the agents, servants and employees of every other Defendant and the acts of each Defendant, as alleged herein, were performed within the course and scope of that agency, service or employment.

33.     Plaintiffs are informed and believe, and on such information and belief allege, that at all relevant times, the Defendants named as officers, directors, agents or employees, acted in such capacities in connection with the acts, practices and schemes of business set forth below.

34.     Whenever any allegation is made in this Complaint to "Defendants" doing any act, the allegation shall mean the act of each individual Defendant acting individually, jointly and severally, and the conspiring of these Defendants to so act. Each Defendant alleged to have committed any act did so pursuant to and in furtherance of a common plan, scheme, and conspiracy and as the agent for each and every co-Defendant. Each Defendant acted in conspiracy to violate the provisions of the California Corporate Securities Law of 1968 (California Corporations Code§§ 25000 et seq.) and to otherwise harm and defraud Plaintiffs.

## DEFENDANTS' FIDUCIARY DUTIES

35.     MISLE is solely the controlling shareholder and manager of ACC.   In that capacity, MISLE is charged with the control and management of the affairs of ACC, representing in this regard the aggregated interest of all the shareholders.  MISLE was at all relevant times, and is now, ACC's agent. In addition, Defendants' receipt of money in trust for ACC by itself created a fiduciary relationship.   ACC's controlling shareholder and manager is a fiduciary to ACC's shareholders.

36.     MISLE is the Majority, Dominant and Controlling Shareholder. Defendants had fiduciary duties in that capacity both to ACC, to Plaintiffs and to other minority shareholders. MISLE as the majority shareholder also has afiduciary responsibility to the minority shareholders and to the corporation to use MISLE's ability to control the corporation in a fair, just, and equitable manner.  MISLE as the majority controlling shareholder is not entitled to use his power to control corporate activities to benefit MISLE alone or to act in any manner detrimental to the minority. Any control of ACC by MISLE is required to benefit all shareholders proportionately and fairly and must not conflict with the proper conduct of ACC's business. MISLE owed a fiduciary duty to protect ACC's corporate interests and assets for the benefit of all shareholders. MISLE was required to avoid exalting Defendants' own interests above those of ACC or above those of ACC's other shareholders. Defendants' dealings with ACC are to be subjected to rigorous scrutiny. The burden is on Defendants to prove the good faith of the challenged transactions and also to show the inherent fairness of those transactions from ACC's viewpoint and those interested therein.   MISLE fails the test-- namely, whether or not, under all the circumstances, each

transaction carries the earmarks of an arm's length bargain. If any transaction does not, Plaintiffs request that equity set it aside.

37.     Defendants owed ACC and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to operate ACC in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of ACC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit or a particular shareholder's interests. Each Defendant owed ACC and its shareholders the fiduciary duty to exercise good faith and diligence, to help use and preserve ACC's property and assets, and exercise the highest obligations of fair dealing. Each Defendant owed ACC and its shareholders the duty to do the following:

a.     Exercise good faith in ensuring that ACC was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority, and also:

b.     To deal with ACC and other shareholders with the utmost fidelity, honesty and fairness.

c.     To honestly, fairly, diligently, and loyally investigate each transaction.

d.     To fully, timely and properly disclose all facts material to each transaction.

e.     To avoid any actual conflict of interest.

f.     To avoid any advantage over ACC.

g.     To avoid making any secret profits.

h.     To avoid transferring to ACC any secret or undisclosed liabilities.

i.     To avoid making any misrepresentations of fact.

j.     To refrain from unduly benefitting themselves and other insiders at the expense of ACC.

k.     To manage, conduct, supervise and direct the business and affairs of ACC in accordance with the corporate documents (*i.e.*, Operating Agreement).

l.      To exercise control and supervision over the officers and employees of ACC.

m.      To ensure that ACC did not engage in unsafe, imprudent or unlawful practices and that ACC complied with all applicable laws and regulations.

n.      To establish guidelines and policies adequately governing the structure and organization of ACC's operations.

o.      To maintain a proper division of authority and responsibility among the officers and directors of ACC so as to prevent the dominance of any officer or director in the conduct of the business and affairs of ACC.

p.      To ensure that ACC did not engage in unsafe, imprudent or unlawful practices and to become and remain informed as to how ACC was, in fact, operating.

q.      To maintain and implement an adequate and functioning system of internal financial and accounting controls, such that ACC's assets would be safeguarded, its financial statements and information would be accurately recorded and reported, and corporate managers would be given prompt notice of serious problems or divergences so that risk to the corporation would be minimized.

r.      To examine and evaluate any reports of examination, audits or other information required by law concerning the financial condition of ACC and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above.

s.      To avoid any false promise of a character likely to influence, persuade or induce action by ACC, including without limitation false statements about Defendants' intentions.

38.     Given MISLE's position with ACC, MISLE's duties were increased in the precise degree that his shareholder position at ACC gave him additional power and control. Moreover, as to those decisions made by MISLE, this obligation would be still stronger, and Defendants' acts are subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness.

## **DEFENDANTS FACE SEVERE ADVERSE PRESUMPTIONS HERE**

39.     Defendants have the burden of showing the "entire fairness" to all shareholders of each transaction with ACC.  The showing required from MISLE is "the most scrupulous inherent fairness" of those transactions in which MISLE possessed a financial, business or other personal interest which does not devolve upon the corporation or all stockholders generally.  If a director and/or officer of a corporation enters into a transaction with the corporation that will inure to his or her individual benefit, the director bears the burden of proving that the transaction is fair, in good faith, and for adequate consideration.  MISLE cannot possibly prove that his transactions with ACC were fair.

40.     It is a general rule of equity jurisprudence that directors and/or officers of a corporation, who acquire knowledge and information, in their fiduciary capacity, of investment or other business opportunity, in the line of their corporation's business, cannot appropriate that opportunity of financial or business gain for themselves as individuals, if the opportunity would, be advantageous to their corporation and the corporation is financially able to accept the opportunity and make the advantageous acquisition. MISLE has the burden of showing the entire fairness of each transaction with ACC and the burden of showing how he obtained each opportunity taken by MISLE which MISLE received any benefit concerning ACC stock or assets. The showing required from MISLE is "the most scrupulous inherent fairness" as to those transactions in which MISLE possessed a financial, business or other personal interest.

41.     Once Plaintiffs prove the existence of a fiduciary duty, which is present here as a matter of law, the burden shifts to Defendants to prove, by clear and convincing evidence, that the transaction resulted from fair dealing and that Defendants have not usurped a corporate opportunity. The clear and convincing standard is met only if the evidence induces in the mind of the trier of fact a reasonable belief that the truth of the facts asserted is highly probable, and that the probability that they are true is substantially greater than the probability that they are false.  In addition:

          a.     Fairness requires not just a fair price, but fair procedures and fair disclosure of information;

        b.      Fairness of price requires taking into consideration all factors and elements which might reasonably enter into the fixing of value; and

        c.      Fairness requires an assessment of significant future growth and value enhancement for the shareholders.

42.      Transactions between MISLE and ACC are subject to strict scrutiny.

**DEFENDANTS' ILLEGAL BUSINESS PRACTICES AND PREDICATE ACTS**

43.      As mentioned, Defendants owed ACC and its shareholders duties of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to operate ACC in a fair, just, honest, and equitable manner.

44.      Defendants were and are required to act in furtherance of the best interests of ACC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit or a particular shareholder's interests.

45.      Each Defendant owed ACC and its shareholders the fiduciary duty to exercise good faith and diligence, to help use and preserve ACC's property and assets, and exercise the highest obligations of fair dealing. Each Defendant owed ACC and its shareholders the duty to do the following:

        a.      ***Exercise Good Faith in Ensuring that ACC was Operated in a Diligent, Honest and Prudent Manner, and Complied with all Applicable Federal and State Laws, Rules, and Regulations***. As only one evidence of many of MISLE's violation of his obligation to act in a diligent, honest and prudent manner, and, thus, put ACC at great risk, MISLE has been compensating employees under the table and off the books to avoid having to pay various state and federally mandated payroll related expenses. In one instance he has been paying an employee in cash in order to aid and abet this employee from avoiding to pay California court ordered child support to his former spouse. RADUSCH is aware of these violations, yet he has allowed these practices to continue.

Also, MISLE, in a pattern of embezzlement that had no boundaries, including Canadian note holders who invested $15 million in ACC. As part of the deal, the note holders would divert $1 million as an investment in an unrelated venture, GENESIS MEDIA, LLC, an entity solely

controlled and operated by MISLE, in exchange for equity in GENESIS MEDIA, LLC.  It took MISLE not less than 72 hours to embezzle $350,000 of such funds, by MISLE wiring funds from the bank account of GENESIS MEDIA, LLC to the personal Malaga Bank account of MISLE's wife, KONECNE.

SELTZER challenged MISLE on all these indiscretions and tried to bring it to the attention of most, if not all, shareholders and note holders for months on end.  The note holders chose to ignore SELTZER's pleas and evidence of wrongdoing because MISLE's manipulation was effective.   Namely, MISLE, in order to best serve their own interest, falsely accused SELTZER of fraud on the basis that MISLE never signed the $15 million Canadian Noteholder Agreement.

b.      **To Deal with ACC and Other Shareholders with the Utmost Fidelity, Honesty and Fairness.**  As an example, though there are many, Defendants violated their duty of fidelity, honesty, and fairness, and acted to misappropriate ACC real estate assets valued at $5.0 million in order to fraudulently transfer these assets into a company that is wholly owned and controlled by MISLE.  MISLE, RADUSCH, KONENCE, INNOVATIVE, among others, actively participated in this fraudulent scheme by acting to cover it up in the company's financial documents, to wit, continuing to show on the company balance sheet that the real estate belongs to ACC when that is not true.

Also, in an effort to bypass SELTZER, MISLE held a secret meeting in August 2018 at ACC's corporate counsel's office, with RADUSCH, Mr. Marsh, and some of the Canadian noteholders in attendance to discuss going public and how to get around the audit that SELTZER had discovered missing millions of dollars by way of the auditors' research.  SELTZER was not aware of this meeting as he received no notice. When SELTZER found out about the secret meeting only hours before, SELTZER confronted MISLE, wherein MISLE told SELTZER to "stay away."  Upon information and belief, MISLE decided to terminate the auditors and to cut SELTZER out of loop at ACC.

Moreover, MISLE often said about all the shareholders and note holders that they were all "giant pains in the ass" and "thorns in my side," and MISLE did not "give a damn about them"

1   since "I already got their money and it was my money now to do whatever I wanted with it."

2       c.   ***To Honestly, Fairly, Diligently, and Loyally Investigate Each***

3   ***Transaction***.  As one (of many) instance of this pattern of egregious conduct, MISLE embezzled

4   $500,000 from ACC for his personal use and then acted to ensure that any and all investigation of

5   the transaction was stopped so as to conceal his theft of this money.

6       d.   ***To Fully, Timely and Properly Disclose all Material Facts***.  Though there

7   are many examples of Defendants' failure to fully, timely and properly disclose all material facts,

8   including Defendants' failure to provide accurate financial reports and status of the operations,

9   one example is the fact that MISLE and RADUSCH have both been aware for some period of

10  time and have been participants for some period of time of negotiations regarding an acquisition

11  of all of the assets of ACC and then subsequent conversion of the company to a public entity.

12  None of this information was disclosed to the shareholders nor was it provided in a timely

13  manner.  Throughout MISLE's and RADUSCH's tenure, there has never been any disclosure of

14  the company's full books and records and associated material transactions, and any validation as

15  to the accuracy of the company's books and records such as they are, and any operational reports,

16  despite numerous written and oral demands that this important information be disclosed.  Such

17  conduct is an egregious violation of laws regarding good governance and the company's own

18  Operating Agreement.

19      e.   ***To Avoid Any Actual Conflict of Interest***.  Among other examples, MISLE

20  and KONECNE have improperly used ACC funds to pay for their personal expenses including

21  paying for lavish spending on personal credit cards, luxury car payments, etc.  On one occasion,

22  in December of 2018, MISLE personally removed $30,000 out of the ACC safe to fund a lavish

23  family vacation in Nassau, Bahamas.

24      f.   ***To Avoid Any Advantage Over ACC***.  Among other examples, MISLE has

25  acted aggressively to violate the ACC Operating Agreement in order to avoid any oversight and

26  scrutiny of his self-dealing, disloyal, and abusive conduct.  He has refused to hold annual

27  shareholder meetings.  He has refused to appoint a proper and independent Board of Directors.

28  He has refused to conduct Board meetings in accordance with the Operating Agreement.  He has

refused and fought to have any oversight.

g.   ***To Avoid Making Any Secret Profits***.  Among other examples, in January 2018, MISLE and KONECNE secretly transferred $350,000 from ACC into a structured fraud scheme that first diverted the money to an ACG bank account and then to a bank account of KONECNE at Malaga Bank. In order to conceal this illicit activity, MISLE ordered that the books falsely record the transaction as "operating expenses real estate", when, in fact, it had nothing to do with operating expenses or real estate, rather personal gain.

h.   ***To Avoid Transferring to ACC Any Secret or Undisclosed Liabilities***.  In yet another example (of many) of MISLE and KONECNE acting to enrich themselves and in the process create a significant liability for ACC, they transferred several millions of dollars from an unrelated venture, GENESIS MEDIA,LLC, to pay unrelated expenses and also perpetrate the pattern of structured financial fraud schemes to enrich himself and KONECNE.  Setting aside that this transaction was improper from the outset, it created a liability for ACC to GENESIS MEDIA,LLC, yet ACC and its shareholders received none of the benefit of the generated liability.

i.   ***To Avoid Making Any Misrepresentations of Fact***.  As an element to stifle the voiced and written concerns and objections of ACC's Co-Manager, Plaintiff PETER SELTZER ("SELTZER"), regarding improper conduct on the part of MISLE and to further intimidate SELTZER to keep his mouth shut.  Indeed, MISLE went to the extraordinary length to prevent SELTZER from visiting the Pahrump facility by knowingly filing a false police report with the Pahrump Sheriff, accusing SELTZER of embezzling his legally authorized salary and demanding the Sheriff arrest SELTZER if he returned to Nye County, Nevada.[2]

Namely, SELTZER, believing MISLE was setting him up all along, had sent a copy of the signed $15 million Canadian Noteholder Agreement to ACC corporate counsel, Mark Hawkins, in September 2018, and then to RADUSCH in December 2018, showing that MISLE signed the Canadian Noteholder Agreement (in three places) and it was emailed directly from MISLE's email, with SELTZER not having even signed for several more months.  Yet, MISLE created a

---

[2] It should be noted that MISLE has been seen paying the Nye County Sheriff in cash for unknown reasons and/or services.

false narrative to accuse SELTZER of forging his signature as MISLE claims to have never signed it.   The Canadian Noteholder Agreement was, in fact, signed three months earlier by MISLE before SELTZER ever did, and MISLE and RADUSCH, as well as ACC's corporate counsel, Mark Hawkins, knew this and yet all allowed SELTZER to be malingered and falsely accused in order to blackmail SELTZER and steal his shares away from him.

This egregious conduct occurred despite the fact that RADUSCH was well aware that SELTZER had done nothing wrong, and, in fact, RADUSCH issued SELTZER a Form 1099 for the very funds that MISLE accused SELTZER of embezzling and took the added step of filing a false police report, though given MISLE's "relationship" with the Nye County Sheriff, it is not surprising that the Nye County Sheriff entertained what would otherwise be a civil matter, speaking nothing that the suspicions were raised when the Nye County Sheriff went to ACC's lawyer's office in Las Vegas, Clark County, Nevada, where SELTZER was visiting, and attempted to arrest SELTZER.   There are an enormous amount of examples of Defendants' misrepresentations of fact.

j.   ***To Refrain from Unduly Benefitting Themselves and Other Insiders at the Expense of ACC***.  As one example (of many) of this improper conduct, MISLE and RADUSCH engaged in secret negotiations for the acquisition and subsequent conversion of ACC to a public company without disclosure or represented participation in said discussions with shareholders or an explanation of any kind as to how, if any, benefit of the transaction accrues to ACC.  These undisclosed negotiations are specifically tailored to benefit MISLE and RADUSCH at the expense of the shareholders.

As another example, MISLE would loot the safe at ACG, a California cultivation facility that has since shut down (though a pending shareholder derivative lawsuit is pending against ACG and MISLE with similar allegations as the instant lawsuit), and take rolls in excess of $10,000 cash on a monthly basis.  Such cash was money from investors of ACC,  a Nevada cultivation facility, as MISLE had told SELTZER on many occasions that ACG was losing money and barely broke even.

Also, MISLE was seen carrying a large bag of cash in the trunk of his personal vehicle  by

1    several people who were told not to report it.  This cash went to MISLE's personal residence.

2            k.        ***To Manage, Conduct, Supervise and Direct the Business and Affairs of***

3    ***ACC in Accordance with the Corporate Documents (i.e., Operating Agreement).*** As one

4    example (of many) of MISLE's improper efforts to conceal his acts at financial impropriety to

5    benefit himself, during a third party audit, MISLE was challenged by SELTZER in August of

6    2018 for his conduct that showed he had embezzled $500,000, MISLE then wrongfully shut down

7    the audit and ordered RADUSCH to no longer enable SELTZER to have access to the company

8    books and financial records.  RADUSCH, in violation of his own fiduciary obligation, acceded to

9    MISLE's demand for concealment and currently continues to follow that improper practice with

10   regard to SELTZER and all other shareholders, despite admitting in writing that the $500,000

11   paid directly to MISLE with the explicit intent to be used as ACC capital funding, was, indeed,

12   never provided to ACC and was fraudulently entered into QuickBooks as part of a "forced entry,

13   in order to conceal the missing $500,000."

14         Also, MISLE claimed on many occasions that SELTZER ran ACC's finances, however,

15   MISLE never allowed SELTZER access to the financial records of ACC until January 2018.

16   However, though SELTZER was allowed access in January 2018, such access was short lived

17   when only eight months later, MISLE cut SELTZER off for good, coincidentally around the time

18   SELTZER began inquiring about MISLE's inexplicable record keeping.

19           l.        ***To Exercise Control and Supervision Over the Officers and Employees of***

20   ***ACC***.  As one example (of many) of this improper conduct, MISLE has ordered on numerous

21   occasions employees to illegally shut off internal cameras so that he can carry out improper

22   activities to include looting the company safe.  On one particular occasion, MISLE ordered that

23   the camera facing the company safe be disabled so that he could personally improperly remove

24   cash for himself.

25           m.       ***To Ensure that ACC Did Not Engage in Unsafe, Imprudent or Unlawful***

26   ***Practices and that ACC Complied with All Applicable Laws and Regulations***.  For one example,

27   other than the other examples set forth in this Complaint (and likely in discovery), MISLE

28   personally paid improper cash payments to government officials.  As yet another example of this

improper conduct, MISLE and KONECNE unlawfully misappropriated and diverted $1.09 million from an ACC investor, Marlau Partners, that was designated for an ACC construction project, solely to himself for their personal enrichment.

As another example, MISLE knowingly took a vehicle owned by ACC (personally guaranteed by SELTZER) and gave it to his recycling company's manager's son to drive for several years.  Indeed, this is the same individual was once terminated by MISLE from ACC because this individual was constantly under the influence at work, and, yet, MISLE turned over a $65,000 SUV to this individual, who eventually totaled the vehicle owned by ACC (personally guaranteed by SELTZER) in several different accidents and MISLE did not seem to care because he had stopped paying the bill eighteen (18) months earlier, thereby knowingly destroying SELTZER's credit for a vehicle that MISLE had essentially stolen for his own self-serving interests.  RADUSCH knew of this situation and did not discharge his fiduciary duty and have ACC pay the bill or pay SELTZER back.  Instead, MISLE and RADUSCH allowed it to continue while SELTZER's credit was destroyed for having guaranteed the vehicle on behalf of ACC years earlier when SELTZER was not aware of MISLE's deviousness.

n. ***To Establish Guidelines and Policies Adequately Governing the Structure and Organization of ACC's Operations***.  MISLE has steadfastly refused to follow good governance guidelines and ACC's Operating Agreement by failing to appoint a proper Board of Directors, hold periodic Board meetings for oversight, hold required annual shareholder meetings, provide timely financial and operating reports.  To this day, despite numerous requests that these guidelines, rules, and procedures be followed, MISLE refuses to conform to these required and reasonable requests.

o. ***To Maintain a Proper Division of Authority and Responsibility Among the Officers and Directors of ACC so as to Prevent the Dominance of Any Officer or Director in the Conduct of the Business and Affairs of ACC***.  As one example (of many) of this egregious conduct, MISLE secretly removed SELTZER from all ACC bank accounts and improperly placed his wife, KONECNE, on these accounts giving only her and himself direct access to any and all ACC bank accounts and control of the associated funds.  This enabled MISLE and KONECNE

1    the opportunity to enrich themselves by looting these accounts without any oversight.

2    　　　　p.    *To Maintain and Implement an Adequate and Functioning System of*
3    *Internal Financial and Accounting Controls, such that ACC's Assets would be Safeguarded, its*
4    *Financial Statements and Information would be Accurately Recorded and Reported, and*
5    *Corporate Managers would be Given Prompt Notice of Serious Problems or Divergences so*
6    *that Risk to the Corporation would be Minimized.*   In addition to the examples already cited
7    above, RADUSCH has admitted, in writing, that ACC's books and financial documents, such as
8    they are, are in complete disarray, are inaccurate, or without any historical support.  In an effort to
9    conceal this egregious situation, MISLE and RADUSCH have embarked on a scheme to construct
10   financial reports out of whole cloth, and certainly would not pass muster under any audit.

11   　　　Also, MISLE refused to allow ACC's professionals to keep financial records.   Namely,
12   ACC's Certified Public Accountant, Steve Marsh, was not allowed to keep copies of bank
13   statements that accurately reflected ACC records.  In 2018, MISLE sat with Mr. Marsh as he
14   looked at bank records, but refused to allow Mr. Marsh to keep any copies of the bank records,
15   and MISLE refused to allow his Co-Manager, SELTZER, from having copies of the bank records
16   that SELTZER requested on more than a dozen occasions.

17   　　　　q.    *To Examine and Evaluate Any Reports of Examination, Audits or Other*
18   *Information Required by Law Concerning the Financial Condition of ACC and to Make Full*
19   *and Accurate Disclosure of all Material Facts Concerning, among other things, each of the*
20   *Subjects and Duties Set Forth Above.*   In order to conceal his egregious self-serving conduct,
21   MISLE ordered that an external audit of ACC by the professional accounting firm of Dale,
22   Matheson, Carr, Hilton, and Labonte, LLP be stopped, in violation of all rules of good
23   governance and the Operating Agreement.

24   　　　　r.    *To Avoid any False Promise of a Character Likely to Influence, Persuade*
25   *or Induce Action by ACC, Including Without Limitation, False Statements about Defendants'*
26   *Intentions.*   As an example (of many) of this improper conduct, an investor of $2.0 million
27   insisted that all of the invested funds must only be used by and for ACC, and not be diverted
28   elsewhere.  MISLE personally promised the investor that all of the investment would be used

exclusively for ACC purposes.   MISLE was specifically warned with regards to MISLE's "fiduciary responsibility" to use all the proceeds only in accordance with the investor's intended and stated purpose.   However, despite MISLE's promise, three days after receiving the $2.0 million, MISLE diverted $400,000 of the $2.0 million out of ACC for his and KONECNE's personal use.

### SPECIFIC PREDICATE ACTS RE STOCK SALES

46.      Defendants' predicate acts include that under 18 U.S.C. § 1951, Defendants each obstructed, delayed, or affected commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspiracy to do so. "Extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear; or under color of official right.

47.      Defendants undertook many predicate acts which constitute mail and wire fraud in that Defendants each: (1) voluntarily and intentionally devised or participated in one or more schemes to defraud; (2) entered into one or more schemes with intent to defraud; (3) knew that it was reasonably foreseeable that the mails would be used in connection with the scheme; and (4) in fact used the mails in furtherance of the scheme.

48.      ACC's shareholders are entitled to an accounting from MISLE and/or RADUSCH, and/or disgorgement by ACC, of all shares owned by Defendants, or pay the appropriate fair market value.

49.      Plaintiffs paid Defendants for ACC shares but never received the shares.

50.      Plaintiffs request that Defendants be barred from participating in any way in any of the monies and/or other benefits recovered in this action.

51.      Defendants' acts have caused great or irreparable injury to ACC and threaten to cause further injury unless their misconduct is enjoined so that ACC is entitled to injunctive relief including without limitation temporary restraining orders, preliminary injunctions and permanent injunctions, including without limitation:

a.      Defendants should be: (1) required to produce all books and records of ACC for Plaintiffs' inspection and/or copying; (2) prohibited from interfering with the production

of books and records of ACC for Plaintiffs' inspection and/or copying; (3) required to protect and maintain ACC's books and records; (4) prohibited from destroying any books and records of ACC; and (5) required to report to and account to this Court, under oath, as to compliance with the Court's requirements.

b.      Defendants should be prohibited from buying and/or selling any ACC shares without prior approval of this Court or until further Court Order and should be required to report to and account to this Court, under oath, as to compliance with the Court's requirements.

c.      Defendants should be prohibited from taking any corporate action on behalf of ACC without full disclosure to all shareholders and to this Court.

d.      Defendants should be prohibited from transferring any property without prior approval of this Court.

e.      Defendants should be prohibited from investing in ACC without prior approval of this Court and should be required to report to and account to this Court, under oath, as to any loans or other investment in ACC.

f.      Defendants should be prohibited from pursuing any opportunity which properly belongs to ACC, and should be prohibited from doing so either individually or with or through any other person, without prior approval of this Court and should be required to report to and account to this Court, under oath, as to any business and/or investment opportunities which Defendants pursue.

g.      Defendants should be prohibited from pursuing any transaction with ACC, and should be prohibited from doing so individually or with or through any other person, without prior approval of this Court and should be required to report to and account to this Court, under oath, as to any business and/or investment transactions with ACC, and as a prerequisite for any Court approval, Defendants should be required to obtain an independent appraisal of the transaction.

h.      Defendants should be held accountable for any violation of any orders of this Court.

52.      Plaintiffs and ACC are entitled to the appointment of a receiver and/or keeper to

1   manage, or to oversee the management of, ACC.

2      53.   Plaintiffs and ACC are entitled to reform all contracts with Defendants to address

3   and reform any unconscionable terms of those contracts.

4      54.   The stock sales in which Defendants sold ACC shares should be cancelled with

5   notice to all remaining shareholders with Defendants required to account to this Court for all

6   stock sales, and to refund all payments to alleged purchasers.

7      55.   ACC is entitled to recover from all legally responsible Defendants:

8         a.   All receipts and/or profits obtained by MISLE from ACC assets.

9         b.   All receipts from MISLE's sales of ACC shares.

10        c.   An accounting of the funds from sales of ACC shares.

11        d.   An accounting of the revenues generated from sales of ACC products.

12        e.   The value of any other benefits received by each Defendant from the

13   usurping of corporate opportunities and/or from other breaches of fiduciary duties.

14        f.   All consideration received by Defendants and the value of consideration

15   received by Defendants if other than money.

16      56.   As a direct and proximate result and consequence of Defendants' wrongdoing as

17   set forth herein, ACC has sustained and incurred general, special, consequential, incidental,

18   compensatory, resulting, proximate, and nominal damages and will continue to sustain and incur

19   such damages in the future, in exact amounts that are presently not known, but which exceed the

20   minimum jurisdictional amount.

21      57.   Each transaction in which Defendants was self-interested (which includes each

22   transaction with respect to ACC's assets, liabilities, contracts and/or stock) is presumptively unfair

23   and may be rescinded. These transactions were not at arm's length. Equity may set aside those

24   transactions involving ACC in which Defendants were self-interested because those transactions

25   are presumptively unfair.  Defendants cannot be allowed to manipulate ACC to its detriment and

26   in disregard of the standards of common decency and honesty. Defendants cannot utilize inside

27   information and strategic position for their own gain. Defendants cannot violate rules of fair play.

28   They cannot use their power for their personal advantage and to the detriment of the shareholders

and creditors no matter how absolute in terms that power may be and no matter how meticulous they attempt to satisfy technical requirements. Where there is a violation of these principles' equity will undo the wrong or intervene to prevent consummation.

58.     Punitive damages are available against each Defendant based on each Defendant's fraud, malice and/or oppression. Defendants' fraud, malice and/or oppression was undertaken by each Defendants, as officers, directors, shareholders, agents, and representatives of ACC and/or MISLE

59.     ACC is entitled to prejudgment interest at the maximum rate permitted by law and compounded in the maximum manner permitted by law in light of Defendants' breaches of fiduciary duty.

60.     Plaintiffs request attorneys' fees under all applicable law including without limitation that Defendants' conduct was in bad faith, that a common fund is being created and pursuant to specific statutory provisions alleged in the claims herein.

61.     Plaintiffs are entitled to the remedy of a constructive trust on the proceeds of sales of ACC stock and ACC products by Defendants, on all accounts in which such monies were commingled. A constructive trust has been defined as one "arising by operation of law against one who, by actual or constructive fraud, by duress or abuse of confidence, or by any form of unconscionable- conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience has acquired the legal right to property he ought not, under equitable principles, hold and enjoy. If a person obtains the legal title to property by such torts or acts or circumstances of circumvention, imposition, or fraud, or if he obtains it by virtue of a confidential relation and influence, under such circumstances that he ought not, in good conscience, to have the beneficial interest thereof, courts of equity will raise a trust by construction out of the circumstances. Such trusts differ from other trusts in that they are not within the intention or contemplation of the parties at the time of the transaction giving rise thereto."

### VICARIOUS LIABILITY

62.     Plaintiffs are informed and believe and thereon allege that Defendants were agents, servants, and employees of their co-Defendants, and that the unnamed parties were the agents,

servants, and employees of Defendants, in doing the things alleged were acting in the scope of their authority as such agents, servants and employees, and with the permission and consent of Defendants.

63.     In undertaking the acts described herein, each Defendant acted in concert to accomplish the common purpose of the schemes alleged herein. Each undertook such acts, as described above, either by ordering, directing and/or permitting other Defendants to take action, or giving assistance or encouragement to take it, as described in this paragraph. Even if such acts were independent acts not part of conspiracy, such acts identify Defendants as concurrent or successive tortfeasors which caused damages as described herein.

64.     Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to, and furtherance of, the wrongdoing. The Defendants' acts of aiding and abetting include, inter alia, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

65.     In committing the wrongful acts alleged herein, Defendants pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design. In furtherance of this plan, conspiracy and course of conduct, defendants, and each of them, took the actions as set forth herein. Each defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of herein. Upon information and belief, the actions taken by defendants herein, and by each of them, alleged in the various causes of action, were taken as part of a scheme, conspiracy or agreement among each of them, for which each of them expected to benefit. The conspiracy included the illegal asset-stripping scheme. In undertaking this conspiracy, each defendant acted in concert to accomplish the common purpose of the illegal asset-stripping scheme, each had actual knowledge of the planned tort and concurred in the

tortious scheme with knowledge of its unlawful purpose. Each undertook such acts either by ordering other Defendants to take action, directing that they take it, permitting them to take it, or assistance or encouragement to take it, as described in this paragraph. But for each one of these Defendants' participation, the illegal asset-stripping scheme could not have been accomplished.

66.     MISLE is the alter ego of all corporate defendants herein – ACC, AMRS, AMRSN, RSI, CALVADA, NREH, and INNOVATIVE (among various other MISLE owned and/or controlled entities) and directs and controls all individual defendants herein - RADUSCH, KONECNE, and LUCCHINO.

67.     Plaintiffs are informed and believe and thereon allege that MISLE is a director and/or officer and/or Manager of at least 27 companies in Nevada, and his wife, KONECNE, is a director and/or officer and/or Manager of at least 4 companies in Nevada, which strongly indicates that such companies are mere shells and shams, conceived, intended, and used by MISLE and KONECNE as a device to avoid individual liability and for the purpose of substituting a financially insolvent corporation in the place of MISLE and KONECNE.  Indeed, the corporate Defendants are, and at all times herein mentioned were, so inadequately capitalized that, compared with the business to be done by them and the risks of loss, their capitalization was illusory or trifling.

68.     Plaintiffs are further informed and believe and thereon allege that Defendants do not respect, follow or honor the requirements of a separate existence of ACC.

69.     Plaintiffs are informed and believe and thereon allege that:

a.      There now exists, and at all times herein mentioned there existed, a unity of interest and ownership between Defendants, such that any individuality and separateness between these Defendants has ceased, and Defendants are the alter ego of MISLE in light of the following circumstances and so that adherence to the fiction of the separate existence of Defendants as entities distinct from MISLE would permit an abuse of the corporate privilege and would sanction fraud and/or promote injustice.

b.      MISLE and/or KONENCE used assets of ACC for his personal uses, caused assets of ACC to be transferred to MISLE and/or KONENCE without adequate

1    consideration, and withdrew funds from ACC's bank accounts for their personal uses.

2           c.      The corporate Defendants are, and at all times herein mentioned were, mere

3    shells, instrumentalities, and conduits through which MISLE has taken complete dominion and

4    exercising complete control to such an extent that any individuality or separateness of the

5    corporate Defendants and MISLE does not, and at all times herein mentioned did not, exist.

6           d.      Namely, the corporate Defendants are, and at all times herein mentioned

7    were, controlled, dominated, and operated by MISLE in that the activities and business of the

8    corporate Defendants were carried out without any corporate formalities (*i.e.,*

9    shareholder/member meetings, minutes of any corporate proceedings, accurate bookkeeping and

10   record keeping).

11          e.      MISLE caused monies to be withdrawn from the funds of ACC and

12   distributed to MISLE and/or KONENCE without sufficient consideration, all for the purpose of

13   avoiding and preventing attachment and execution by creditors, including Plaintiffs, thereby

14   rendering Defendants insolvent and unable to meet its obligations.

15                                   **DEMAND FUTILITY**

16          70.     MISLE is either now the sole member of the Board of Directors of ACC or MISLE

17   has dissolved the Board of ACC such that he acts with no oversight and does as he pleases, or has

18   appointed an unknown Board of cronies to the same effect.  The fact is that the shareholders are

19   not informed or advised of the current Board situation as required and thus ACC has no proper

20   oversight as to MISLE's conduct or any means of addressing issues for proper investigation and

21   oversight.

22          71.     It would be futile for Plaintiffs to make demand upon the Board of Directors of

23   ACC to correct the acts complained of herein.

24          72.     Therefore, Plaintiffs bring this action derivatively on behalf of ACC, without

25   making demand upon the Board of ACC for the following reasons: MISLE now constitutes the

26   entire Board. Even if he appointed another Director, which Plaintiffs believe has not occurred,

27   MISLE, as majority controlling shareholder, would continue to control and dominate ACC's

28   Board.

73.     MISLE has made it clear to other shareholders that should another Board member be appointed, he will decide who that Board member is to be in order to ensure that that person is under his control, thus making any pretense of an independent Board member looking out for the shareholders' best interests laughable.

74.     MISLE has been the sole voice in dominating the policy or any particular act of ACC. There was never a known instance in which MISLE failed to achieve what he desired from the so-called Board.

75.     For this reason alone, any demand to the Board to prosecute the majority controlling shareholder and/or to recover assets looted by MISLE would have been utterly futile, unavailing and needlessly time-consuming.

76.     MISLE, as the sole manager and majority controlling shareholder, has never called a formal shareholder meeting for which he did not comply with ACC's Operating Agreement. MISLE unilaterally reduced the number of required Directors to one, that is, himself.

77.     As alleged herein, he acted in a fraudulent and manipulative fashion. For these reasons, any demand to the Board to prosecute the sole Manager and Director and/or to set aside actions taken by MISLE would have been utterly futile, unavailing and needlessly time-consuming.

**STATUTE OF LIMITATIONS**

78.     The statute of limitations for the causes of action herein alleged did not accrue because MISLE constructively defrauded Plaintiffs and ACC, and failed to disclose those material facts which would have revealed the factual basis for Plaintiffs' claims. MISLE's fiduciary relationship to ACC and actual fraud precludes accrual of the limitation period. A mere vague doubt as to a fiduciary's performance of professional duties does not constitute discovery of a cause of action.

79.     Accrual of the rescission claim was delayed here based on the four-year statute of limitations for rescission of a written contract.

80.     The statute of limitations for the causes of action herein alleged were tolled: (1) because MISLE constructively defrauded Plaintiffs and ACC and failed to disclose those material

facts which would have revealed the factual basis for Plaintiffs' claims; (2) until the last overt act of the conspiracy alleged herein. Actual fraud at least tolls the statute of limitations and some authority indicates that fraud precludes the statute of limitations defense.

**DIRECT AND INDIVIDUAL CLAIMS BY PLAINTIFFS**

**FIRST CAUSE OF ACTION**

**DENIAL OF ACCESS TO ACC BOOKS AND RECORDS BY PLAINTIFFS**

**INDIVIDUALLY AGAINST DEFENDANTS**

**Count 1:**

**Denial of Statutory Rights of Access**

81.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

82.    Plaintiffs each have a statutory right to review ACC's books and records.

83.    A fellow shareholder has demanded an opportunity to review ACC's books and records and has fully complied with any and all applicable laws that shareholder wishes to allow Plaintiffs and/or their representative to inspect the books and records of ACC.

84.    Plaintiffs have a proper purpose in reviewing ACC's books and records, as follows:

a.    To investigate the purchase and sale of stock by any legal person (including entities) in which Defendants has any direct, indirect, beneficial or other financial interest including indirectly through MISLE or the name of an individual acting as his agent or shill. To investigate whether Defendants usurped ACC's corporate opportunities and assets and profits to which ACC is entitled;

b.    To investigate self-dealing by Defendants, and each of them;

c.    To determine the genuineness or lack of genuineness of sales by Defendants;

d.    To investigate whether any Company officers, directors or employees have breached their fiduciary duties and wasted corporate assets;

e.    To evaluate whether a valid basis exists to bring a shareholder action related to ACC or individual directors to challenge any breach of fiduciary duty or breach of duty

-31-

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

1  of loyalty to ACC, or to seek an injunction against ACC; and/or

2        f.      To communicate with ACC's other shareholders on matters relating to their

3  interests as shareholders.

4        g.      To communicate with ACC's creditors on matters relating to their interests

5  as creditors.

6  85.      Defendants have abused their authority in preventing access to ACC's books and

7  records.

8  86.      Defendants should be required, by writ of mandate, injunctive relief or otherwise:

9        a.      To affirmatively make ACC's books and records available to Plaintiffs.

10       b.      To not inhibit access ACC's books and records.

11       c.      To affirmatively locate, secure and protect ACC's books and records.

12       d.      To do nothing to change, damage, misplace and/or destroy ACC's books

13  and records.

14  87.      Plaintiffs request money damages, attorneys' fees, costs and all available equitable,

15  legal and related remedies against Defendants, jointly and severally.

16                              **Count 2:**

17          **Tortious Denial of Access to ACC Books and Records**

18  88.      The allegations of the previous paragraphs are re-alleged and incorporated here by

19  this reference.

20  89.      In limiting access to ACC's books and records, Defendants acted with oppression,

21  fraud or malice, and based thereon Plaintiffs request punitive damages.

22                        **SECOND CAUSE OF ACTION**

23  **OPPRESSION OF MINORITY SHAREHOLDERS BY PLAINTIFFS AND BREACH OF**

24          **FIDUCIARY DUTY RE CONTROL OF ACC AND ITS ASSETS**

25  90.      The allegations of the previous paragraphs are re-alleged and incorporated here by

26  this reference.

27  91.      As the majority shareholders, Defendants owe fiduciary duties to Plaintiffs as

28  minority shareholders and have breached their duties by:

-32-

a.     Exercising control over ACC which is not fair to Plaintiffs as minority shareholders;

b.     Favoring themselves over Plaintiffs;

c.     Arranging for unequal and inequitable distributions of ACC assets to themselves only.

92.     Defendants threaten to continue their misconduct unchecked and there are no corporate governance provisions in place to prevent future occurrences of such wrongdoing.

93.     Plaintiffs incorporate here the allegations of the Causes of Action below and in the event relief is only available to Plaintiffs individually and not on a derivative basis, such as if ACC is dissolved or otherwise does not exist when relief is to be granted, Plaintiffs request money damages, attorneys' fees, costs and all available equitable, legal and related remedies.

94.     Plaintiffs as minority shareholders have been wrongly excluded from the benefit of the transactions alleged herein in which Defendants profited.

95.     Defendants have caused Plaintiffs to be treated differently in relation to ACC assets.

96.     Defendants have diluted the economic value of Plaintiffs' interests in ACC, because many millions of dollars of revenue producing assets have simply vanished and the minority shareholders have and will receive nothing for them while Defendants have profited from their plunder of ACC!

97.     Plaintiffs also request equitable relief in the form of Orders and/or Judgment as follows:

a.     That Defendants' voting rights as ACC shareholders be suspended until further Court order.

b.     That the minority shareholders of ACC be given notice of all decisions of ACC's Board to the extent a Board actually exists.

c.     That Defendants be removed from any positions in ACC and that any further exercise of any authority on behalf of ACC may be addressed by contempt proceedings.

d.     That the minority shareholders of ACC be awarded veto power of any

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1   decision by ACC's Board, to the extent a Board actually exists.

2          e.      That the decisions of ACC's Board may not be implemented until five (5)

3   days after receipt by the minority shareholders of notice of all decisions of ACC's Board.

4          f.      That Defendants be prohibited from using corporate funds to finance their

5   defense in this case.

6          g.      That Defendants be required to pay for a valuation of ACC to the Court

7   that the Court finds such a valuation necessary or appropriate.

8          h.      That a receiver and/or keeper be appointed at Defendants' expense to

9   protect ACC's assets.

10         98.     Defendants acted with oppression, fraud, and malice, and based therein, Plaintiffs

11  request punitive damages.

12                          **DERIVATIVE CLAIMS**

13                          **THIRD CAUSE OF ACTION**

14      **BREACH OF FIDUCIARY DUTIES RE LOOTING OF ACC AGAINST ALL**

15                              **DEFENDANTS**

16                              <u>**Count 1:**</u>

17                          <u>**Breach of Fiduciary Duty**</u>

18         99.     The allegations of the previous paragraphs are re-alleged and incorporated herein

19  by this reference.

20         100.    Defendants had a duty to preserve ACC assets and their looting of ACC's assets

21  violated that duty and was very damaging to ACC's economic interests and Plaintiffs are entitled

22  to recover damages on behalf of ACC, and/or disgorgement and other remedies alleged herein.

23  88. Defendants acted with oppression, fraud or malice, and based thereon Plaintiffs request

24  punitive damages.

25                              <u>**Count 2:**</u>

26                              <u>**Conversion**</u>

27         101.    The allegations of the previous paragraphs are re-alleged and incorporated here by

28  this reference.

-34-

102.    Defendants converted ACC assets to their own use and/or to the use of persons other than ACC.

103.    Plaintiffs are entitled to recover damages on behalf of ACC, and/or disgorgement and other remedies alleged herein.

104.    Defendants acted with oppression, fraud or malice, and based thereon Plaintiffs request punitive damages.

### Count 3:

### Negligent Dissolution

105.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

106.    Defendants have been negligent in the manner in which they are dissolving ACC and disposing of its assets.

107.    Plaintiffs are entitled to recover damages on behalf of ACC, and/or disgorgement and other remedies alleged herein.

### FOURTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

108.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

109.    ACC was injured by Defendants' acts and omissions, as follows:

a.    ***Exercise Good Faith in Ensuring that ACC was Operated in a Diligent, Honest and Prudent Manner, and Complied with all Applicable Federal and State Laws, Rules, and Regulations.*** As only one evidence of many of MISLE's violation of his obligation to act in a diligent, honest and prudent manner, and, thus, put ACC at great risk, MISLE has been compensating employees under the table and off the books to avoid having to pay various state and federally mandated payroll related expenses. In one instance he has been paying an employee in cash in order to aid and abet this employee from avoiding to pay California court ordered child support to his former spouse. RADUSCH is aware of these violations, yet he has allowed these practices to continue.

Also, MISLE, in a pattern of embezzlement that had no boundaries, including Canadian note holders who invested $15 million in ACC. As part of the deal, the note holders would divert $1 million as an investment in an unrelated venture, GENESIS MEDIA, LLC, an entity solely controlled and operated by MISLE, in exchange for equity in GENESIS MEDIA, LLC. It took MISLE not less than 72 hours to embezzle $350,000 of such funds, by MISLE wiring funds from the bank account of GENESIS MEDIA, LLC to the personal Malaga Bank account of MISLE's wife, KONECNE.

SELTZER challenged MISLE on all these indiscretions and tried to bring it to the attention of most, if not all, shareholders and note holders for months on end. The note holders chose to ignore SELTZER's pleas and evidence of wrongdoing because MISLE's manipulation was effective. Namely, MISLE, in order to best serve their own interest, falsely accused SELTZER of fraud on the basis that MISLE never signed the $15 million Canadian Noteholder Agreement.

b.      ***To Deal with ACC and Other Shareholders with the Utmost Fidelity, Honesty and Fairness.*** As an example, though there are many, Defendants violated their duty of fidelity, honesty, and fairness, and acted to misappropriate ACC real estate assets valued at $5.0 million in order to fraudulently transfer these assets into a company that is wholly owned and controlled by MISLE. MISLE, RADUSCH, KONENCE, INNOVATIVE, among others, actively participated in this fraudulent scheme by acting to cover it up in the company's financial documents, to wit, continuing to show on the company balance sheet that the real estate belongs to ACC when that is not true.

Also, in an effort to bypass SELTZER, MISLE held a secret meeting in August 2018 at ACC's corporate counsel's office, with RADUSCH, Mr. Marsh, and some of the Canadian noteholders in attendance to discuss going public and how to get around the audit that SELTZER had discovered missing millions of dollars by way of the auditors' research. SELTZER was not aware of this meeting as he received no notice. When SELTZER found out about the secret meeting only hours before, SELTZER confronted MISLE, wherein MISLE told SELTZER to "stay away." Upon information and belief, MISLE decided to terminate the auditors and to cut

1    SELTZER out of loop at ACC.

2         Moreover, MISLE often said about all the shareholders and note holders that they were all

3    "giant pains in the ass" and "thorns in my side," and MISLE did not "give a damn about them"

4    since "I already got their money and it was my money now to do whatever I wanted with it."

5         c.   **To Honestly, Fairly, Diligently, and Loyally Investigate Each**

6    **Transaction**.  As one (of many) instance of this pattern of egregious conduct, MISLE embezzled

7    $500,000 from ACC for his personal use and then acted to ensure that any and all investigation of

8    the transaction was stopped so as to conceal his theft of this money.

9         d.   **To Fully, Timely and Properly Disclose all Material Facts**.  Though there

10   are many examples of Defendants' failure to fully, timely and properly disclose all material facts,

11   including Defendants' failure to provide accurate financial reports and status of the operations,

12   one example is the fact that MISLE and RADUSCH have both been aware for some period of

13   time and have been participants for some period of time of negotiations regarding an acquisition

14   of all of the assets of ACC and then subsequent conversion of the company to a public entity.

15   None of this information was disclosed to the shareholders nor was it provided in a timely

16   manner.  Throughout MISLE's and RADUSCH's tenure, there has never been any disclosure of

17   the company's full books and records and associated material transactions, and any validation as

18   to the accuracy of the company's books and records such as they are, and any operational reports,

19   despite numerous written and oral demands that this important information be disclosed.  Such

20   conduct is an egregious violation of laws regarding good governance and the company's own

21   Operating Agreement.

22         e.   **To Avoid Any Actual Conflict of Interest**.  Among other examples, MISLE

23   and KONECNE have improperly used ACC funds to pay for their personal expenses including

24   paying for lavish spending on personal credit cards, luxury car payments, etc.  On one occasion,

25   in December of 2018, MISLE personally removed $30,000 out of the ACC safe to fund a lavish

26   family vacation in Nassau, Bahamas.

27         f.   **To Avoid Any Advantage Over ACC**.  Among other examples, MISLE has

28   acted aggressively to violate the ACC Operating Agreement in order to avoid any oversight and

scrutiny of his self-dealing, disloyal, and abusive conduct. He has refused to hold annual shareholder meetings. He has refused to appoint a proper and independent Board of Directors. He has refused to conduct Board meetings in accordance with the Operating Agreement. He has refused and fought to have any oversight.

g. *To Avoid Making Any Secret Profits*. Among other examples, in January 2018, MISLE and KONECNE secretly transferred $350,000 from ACC into a structured fraud scheme that first diverted the money to an ACG bank account and then to a bank account of KONECNE at Malaga Bank. In order to conceal this illicit activity, MISLE ordered that the books falsely record the transaction as "operating expenses real estate", when, in fact, it had nothing to do with operating expenses or real estate, rather personal gain.

h. *To Avoid Transferring to ACC Any Secret or Undisclosed Liabilities*. In yet another example (of many) of MISLE and KONECNE acting to enrich themselves and in the process create a significant liability for ACC, they transferred several millions of dollars from an unrelated venture, GENESIS MEDIA,LLC, to pay unrelated expenses and also perpetrate the pattern of structured financial fraud schemes to enrich himself and KONECNE. Setting aside that this transaction was improper from the outset, it created a liability for ACC to GENESIS MEDIA,LLC, yet ACC and its shareholders received none of the benefit of the generated liability.

i. *To Avoid Making Any Misrepresentations of Fact*. As an element to stifle the voiced and written concerns and objections of ACC's Co-Manager, Plaintiff PETER SELTZER ("SELTZER"), regarding improper conduct on the part of MISLE and to further intimidate SELTZER to keep his mouth shut. Indeed, MISLE went to the extraordinary length to prevent SELTZER from visiting the Pahrump facility by knowingly filing a false police report with the Pahrump Sheriff, accusing SELTZER of embezzling his legally authorized salary and demanding the Sheriff arrest SELTZER if he returned to Nye County, Nevada.

Namely, SELTZER, believing MISLE was setting him up all along, had sent a copy of the signed $15 million Canadian Noteholder Agreement to ACC corporate counsel, Mark Hawkins, in September 2018, and then to RADUSCH in December 2018, showing that MISLE signed the Canadian Noteholder Agreement (in three places) and it was emailed directly from MISLE's

email, with SELTZER not having even signed for several more months.  Yet, MISLE created a false narrative to accuse SELTZER of forging his signature as MISLE claims to have never signed it.  The Canadian Noteholder Agreement was, in fact, signed three months earlier by MISLE before SELTZER ever did, and MISLE and RADUSCH, as well as ACC's corporate counsel, Mark Hawkins, knew this and yet all allowed SELTZER to be malingered and falsely accused in order to blackmail SELTZER and steal his shares away from him.

This egregious conduct occurred despite the fact that RADUSCH was well aware that SELTZER had done nothing wrong, and, in fact, RADUSCH issued SELTZER a Form 1099 for the very funds that MISLE accused SELTZER of embezzling and took the added step of filing a false police report, though given MISLE's "relationship" with the Nye County Sheriff, it is not surprising that the Nye County Sheriff entertained what would otherwise be a civil matter, speaking nothing that the suspicions were raised when the Nye County Sheriff went to ACC's lawyer's office in Las Vegas, Clark County, Nevada, where SELTZER was visiting, and attempted to arrest SELTZER.  There are an enormous amount of examples of Defendants' misrepresentations of fact.

j.    ***To Refrain from Unduly Benefitting Themselves and Other Insiders at the Expense of ACC.*** As one example (of many) of this improper conduct, MISLE and RADUSCH engaged in secret negotiations for the acquisition and subsequent conversion of ACC to a public company without disclosure or represented participation in said discussions with shareholders or an explanation of any kind as to how, if any, benefit of the transaction accrues to ACC.  These undisclosed negotiations are specifically tailored to benefit MISLE and RADUSCH at the expense of the shareholders.

As another example, MISLE would loot the safe at ACG, a California cultivation facility that has since shut down (though a pending shareholder derivative lawsuit is pending against ACG and MISLE with similar allegations as the instant lawsuit), and take rolls in excess of $10,000 cash on a monthly basis.  Such cash was money from investors of ACC, a Nevada cultivation facility, as MISLE had told SELTZER on many occasions that ACG was losing money and barely broke even.

1   Also, MISLE was seen carrying a large bag of cash in the trunk of his personal vehicle  by

2   several people who were told not to report it.  This cash went to MISLE's personal residence.

3   k.   **To Manage, Conduct, Supervise and Direct the Business and Affairs of**

4   **ACC in Accordance with the Corporate Documents (i.e., Operating Agreement).** As one

5   example (of many) of MISLE's improper efforts to conceal his acts at financial impropriety to

6   benefit himself, during a third party audit, MISLE was challenged by SELTZER in August of

7   2018 for his conduct that showed he had embezzled $500,000, MISLE then wrongfully shut down

8   the audit and ordered RADUSCH to no longer enable SELTZER to have access to the company

9   books and financial records.  RADUSCH, in violation of his own fiduciary obligation, acceded to

10   MISLE's demand for concealment and currently continues to follow that improper practice with

11   regard to SELTZER and all other shareholders, despite admitting in writing that the $500,000

12   paid directly to MISLE with the explicit intent to be used as ACC capital funding, was, indeed,

13   never provided to ACC and was fraudulently entered into QuickBooks as part of a "forced entry,

14   in order to conceal the missing $500,000."

15   Also, MISLE claimed on many occasions that SELTZER ran ACC's finances, however,

16   MISLE never allowed SELTZER access to the financial records of ACC until January 2018.

17   However, though SELTZER was allowed access in January 2018, such access was short lived

18   when only eight months later, MISLE cut SELTZER off for good, coincidentally around the time

19   SELTZER began inquiring about MISLE's inexplicable record keeping.

20   l.   **To Exercise Control and Supervision Over the Officers and Employees of**

21   **ACC.**  As one example (of many) of this improper conduct, MISLE has ordered on numerous

22   occasions employees to illegally shut off internal cameras so that he can carry out improper

23   activities to include looting the company safe.  On one particular occasion, MISLE ordered that

24   the camera facing the company safe be disabled so that he could personally improperly remove

25   cash for himself.

26   m.   **To Ensure that ACC Did Not Engage in Unsafe, Imprudent or Unlawful**

27   **Practices and that ACC Complied with All Applicable Laws and Regulations.**  For one example,

28   other than the other examples set forth in this Complaint (and likely in discovery), MISLE

-40-

personally paid improper cash payments to government officials.  As yet another example of this improper conduct, MISLE and KONECNE unlawfully misappropriated and diverted $1.09 million from an ACC investor, Marlau Partners, that was designated for an ACC construction project, solely to himself for their personal enrichment.

As another example, MISLE knowingly took a vehicle owned by ACC (personally guaranteed by SELTZER) and gave it to his recycling company's manager's son to drive for several years.  Indeed, this is the same individual was once terminated by MISLE from ACC because this individual was constantly under the influence at work, and, yet, MISLE turned over a $65,000 SUV to this individual, who eventually totaled the vehicle owned by ACC (personally guaranteed by SELTZER) in several different accidents and MISLE did not seem to care because he had stopped paying the bill eighteen (18) months earlier, thereby knowingly destroying SELTZER's credit for a vehicle that MISLE had essentially stolen for his own self-serving interests.   RADUSCH knew of this situation and did not discharge his fiduciary duty and have ACC pay the bill or pay SELTZER back.  Instead, MISLE and RADUSCH allowed it to continue while SELTZER's credit was destroyed for having guaranteed the vehicle on behalf of ACC years earlier when SELTZER was not aware of MISLE's deviousness.

n.      *To Establish Guidelines and Policies Adequately Governing the Structure and Organization of ACC's Operations*.  MISLE has steadfastly refused to follow good governance guidelines and ACC's Operating Agreement by failing to appoint a proper Board of Directors, hold periodic Board meetings for oversight, hold required annual shareholder meetings, provide timely financial and operating reports.  To this day, despite numerous requests that these guidelines, rules, and procedures be followed, MISLE refuses to conform to these required and reasonable requests.

o.      *To Maintain a Proper Division of Authority and Responsibility Among the Officers and Directors of ACC so as to Prevent the Dominance of Any Officer or Director in the Conduct of the Business and Affairs of ACC*.  As one example (of many) of this egregious conduct, MISLE secretly removed SELTZER from all ACC bank accounts and improperly placed his wife, KONECNE, on these accounts giving only her and himself direct access to any and all

1    ACC bank accounts and control of the associated funds.  This enabled MISLE and KONECNE
2    the opportunity to enrich themselves by looting these accounts without any oversight.

3          p.    *To Maintain and Implement an Adequate and Functioning System of*
4    *Internal Financial and Accounting Controls, such that ACC's Assets would be Safeguarded, its*
5    *Financial Statements and Information would be Accurately Recorded and Reported, and*
6    *Corporate Managers would be Given Prompt Notice of Serious Problems or Divergences so*
7    *that Risk to the Corporation would be Minimized*.  In addition to the examples already cited
8    above, RADUSCH has admitted, in writing, that ACC's books and financial documents, such as
9    they are, are in complete disarray, are inaccurate, or without any historical support.  In an effort to
10   conceal this egregious situation, MISLE and RADUSCH have embarked on a scheme to construct
11   financial reports out of whole cloth, and certainly would not pass muster under any audit.

12         Also, MISLE refused to allow ACC's professionals to keep financial records.   Namely,
13   ACC's Certified Public Accountant, Steve Marsh, was not allowed to keep copies of bank
14   statements that accurately reflected ACC records.  In 2018, MISLE sat with Mr. Marsh as he
15   looked at bank records, but refused to allow Mr. Marsh to keep any copies of the bank records,
16   and MISLE refused to allow his Co-Manager, SELTZER, from having copies of the bank records
17   that SELTZER requested on more than a dozen occasions.

18         q.    *To Examine and Evaluate Any Reports of Examination, Audits or Other*
19   *Information Required by Law Concerning the Financial Condition of ACC and to Make Full*
20   *and Accurate Disclosure of all Material Facts Concerning, among other things, each of the*
21   *Subjects and Duties Set Forth Above*.  In order to conceal his egregious self-serving conduct,
22   MISLE ordered that an external audit of ACC by the professional accounting firm of Dale,
23   Matheson, Carr, Hilton, and Labonte, LLP be stopped, in violation of all rules of good
24   governance and the Operating Agreement.

25         r.    *To Avoid any False Promise of a Character Likely to Influence, Persuade*
26   *or Induce Action by ACC, Including Without Limitation, False Statements about Defendants'*
27   *Intentions*.  As an example (of many) of this improper conduct, an investor of $2.0 million
28   insisted that all of the invested funds must only be used by and for ACC, and not be diverted

-42-

elsewhere.  MISLE personally promised the investor that all of the investment would be used exclusively for ACC purposes.  MISLE was specifically warned with regards to MISLE's "fiduciary responsibility" to use all the proceeds only in accordance with the investor's intended and stated purpose.  However, despite MISLE's promise, three days after receiving the $2.0 million, MISLE diverted $400,000 of the $2.0 million out of ACC for his and KONECNE's personal use.

110.    Defendants' aforementioned conduct was without good cause and breached Defendants' fiduciary duties to ACC of loyalty.

111.    ACC is entitled to damages including without limitation for the breaches of fiduciary duties and Defendants, jointly and severally.

**Count 2:**

**Mismanagement**

112.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

**Count 3:**

**Waste**

113.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

**FIFTH CAUSE OF ACTION**

**BREACHES OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS**

114.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

115.    Defendants had fiduciary duties, as alleged above, and ACC has been damaged, as alleged above, by Defendants breaches of their fiduciary duties, as alleged above, by each of the following acts and/or omissions (which are each defined above):

Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

1

**SIXTH CAUSE OF ACTION**

2

**CORPORATE WASTE AGAINST ALL DEFENDANTS**

3   116.   The allegations of the previous paragraphs are re-alleged and incorporated here by

4   this reference.

5   117.   Defendants had a duty to preserve and protect corporate, as alleged above, and

6   ACC has been damaged, as alleged above, by Defendants' waste of corporate assets, as alleged

7   above, by each of the following acts and/or omissions· (which are each defined above):

8   Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the

9   basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

10

**SEVENTH CAUSE OF ACTION**

11

**MISMANAGEMENT AGAINST ALL DEFENDANTS**

12   118.   The allegations of the previous paragraphs are re-alleged and incorporated here by

13   this reference.

14   119.   Defendants had a duty to reasonably manage ACC and ACC has been damaged,

15   as alleged above, by Defendants' mismanagement, as alleged above, by each of the following

16   acts and/or omissions (which are each defined above):

17   Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the

18   basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

19

**EIGHTH CAUSE ACTION**

20

**NEGLIGENCE AGAINST ALL DEFENDANTS**

21   120.   The allegations of the previous paragraphs are re-alleged and incorporated here by

22   this reference.

23   121.   Defendants had a duty to exercise reasonable care, as alleged above, and ACC has

24   been damaged, as alleged above, by Defendants' failure to exercise reasonable care, as alleged

25   above, by each of the following acts and/or omissions (which are each defined above):

26   Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the

27   basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

28

-44-

1

## NINTH CAUSE OF ACTION

2

## CONVERSION AGAINST ALL DEFENDANTS

3

122.    The allegations of the previous paragraphs are re-alleged and incorporated here

4

by this reference.

5

123.    Defendants had a duty to protect ACC's ownership of its assets, as alleged above,

6

and ACC has been damaged, as alleged above, by Defendants' conversion of corporate assets, as

7

alleged above, by each of the following acts and/or omissions (which are each defined above):

8

Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the

9

basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

10

## TENTH CAUSE OF ACTION

11

## UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

12

124.    The allegations of the previous paragraphs are re-alleged and incorporated here

13

by this reference.

14

125.    Defendants were unjustly enriched, as alleged above, and must be required to

15

disgorge, as alleged above, by each of the following acts and/or omissions (which are each

16

defined above):

17

Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the

18

basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

19

## ELEVENTH CAUSE OF ACTION

20

## ABUSE OF CONTROL AGAINST ALL DEFENDANTS

21

126.    The allegations of the previous paragraphs are re-alleged and incorporated here

22

by this reference.

23

127.    Defendants had a duty to use their power and authority in a manner which

24

considered the interests of all shareholders, as alleged above, and ACC has been damaged, as

25

alleged above, by Defendants' abuses of control, as alleged above, by each of the following acts

26

and/or omissions (which are each defined above):

27

Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the

28

basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

### ELEVENTH CAUSE OF ACTION

### SUPPRESSION OF MATERIAL FACTS AGAINST ALL DEFENDANTS

128.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

129.    Defendants had a duty to disclose all material facts about the corporate opportunities which they usurped and ACC has been damaged, as alleged above, by its actual and justifiable reliance on Defendants' silence at those times when each of the following (which are each defined above) was occurring and when Defendants were required to disclose all material facts about the following:

Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

### TWELFTH CAUSE OF ACTION

### CONSTRUCTIVE FRAUD AGAINST ALL DEFENDANTS

130.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

131.    Defendants had a duty to disclose all material facts about the corporate opportunities which they usurped and ACC has been damaged, as alleged above, by its actual and justifiable reliance on Defendants' silence at those times when each of the following (which are each defined above) was occurring and when Defendants were required to disclose all material facts about each of the following:

Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

### THIRTEENTH CAUSE OF ACTION

### NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### AGAINST ALL DEFENDANTS

132.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

133.    Defendants were aware or should have been aware that if they did not act with

1    due care their actions would interfere with ACC's capital raising activity and cause ACC to lose

2    in whole or in part the probable future economic benefit or advantage of the relationships.

3         134.    Defendants failed to exercise due care based on their conduct alleged above and

4    their wrongdoing injured ACC as alleged above, concerning each of the following (which are

5    each defined above):

6         Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the

7    basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

8                            **FOURTEENTH CAUSE OF ACTION**

9    **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

10                          **AGAINST ALL DEFENDANTS**

11        135.    The allegations of the previous paragraphs are re-alleged and incorporated here by

12   this reference.

13        136.    Defendants knew of, and ignored, ACCs Prospective Economic Advantage, and

14   ACC was damages because Defendants interfered with the prospective economic advantage

15   identified above as to each of the following (which are each defined above):

16        Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the

17   basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

18                            **FIFTEENTH CAUSE OF ACTION**

19   **VIOLATIONS OF B. & P. CODE §§ 17200 and 17500 AGAINST ALL DEFENDANTS**

20        137.    The allegations of the previous paragraphs are re-alleged and incorporated here by

21   this reference.

22        138.    California Business and Professions Code sections 17200 and 17500 prohibit acts

23   of unfair competition, w0ich shall mean and include any "unlawful, unfair or fraudulent business

24   act or practice."

25        139.    Defendants violated sections 17200 and 17500 by each of the following (which

26   are each defined above), a result of which is that Plaintiffs are entitled to all appropriate

27   equitable relief including disgorgement:

28        Plaintiffs incorporates herein by this reference all the breaches of duties, as well as the

---

-47-

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

basis of recovery herein, set forth in their allegations above in paragraphs (a) - (r).

### SIXTEENTH CAUSE OF ACTION

### RICO VIOLATIONS§ 1962(a) AGAINST ALL DEFENDANTS

140.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

141.    Plaintiffs seek remedies for Defendants' violations of 18 U.S.C. § 1962(a) which addresses the investment of racketeering income in legitimate businesses and specifically makes it unlawful for any person who has received any income derived ... from a pattern of racketeering activity ... to invest ... any part of such income .. . acquisition of an interest in, or the establishment or operation of, any enterprise ... ."

142.    Defendants invested monies which had been derived from a pattern of racketeering activity alleged above.  Specifically, Defendants invested monies in ACC which had been, on information and belief, (1) laundered by Defendants through various entities, (2) obtained by Defendants' illegal sales of shares and/or product by which they usurped ACC's opportunities and (3) obtained by Defendants actually taking key assets of ACC.

143.    Plaintiffs and ACC were each injured in their business and property by Defendants' violations of § 1962(a) and incurred the damages alleged above.

### SEVENTEENTH CAUSE OF ACTION

### RICO VIOLATIONS§ 1962(b) AGAINST ALL DEFENDANTS

144.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

145.    Plaintiffs seek remedies for Defendants' violation of 18 U.S.C. § 1962(b) which addresses the interest in or control of an enterprise and specifically makes it unlawful for a person "to acquire or maintain . . . any interest in or ·control of any enterprise" through a pattern of racketeering activity.

146.    Defendants acquired and maintained their interest in ACC through a pattern of racketeering activity as alleged above.

147.    Plaintiffs and ACC were each injured in their business and property by

-48-

Defendants' violations of §1962(b) and incurred the damages alleged above.

## EIGHTEENTH CAUSE OF ACTION

### RICO VIOLATIONS§ 1962(c) AGAINST ALL DEFENDANTS

148.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

149.    Plaintiffs seek remedies for Defendants' violations of 18 U.S.C. § 1962(c) which addresses the conduct of an enterprise and specifically makes it unlawful to "conduct or participate, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity. The four primary elements of this subsection, as set out by the Supreme Court, are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."

150.    Defendants are liable for "participat[ing]" in the "conduct" of the enterprise because they "have some part in directing [the enterprise's] affairs," under the "operation or management" test articulated by the Eighth Circuit. Defendants are either (1) upper management, (2) under the direction of upper management, (3) persons associated with the enterprise who exert control over it, and (4) outsiders who participate in the operation or management of the enterprise.

151.    Liability attaches here to punish only those persons who run ACC illegally and not the enterprise itself, which is an innocent victim of the racketeering activity. The "person" and "enterprise" are separate in the law.

152.    There is an association-in-fact enterprise which is comprised of the corporate and individual Defendants who move from enterprise to enterprise, and conduct themselves in similar ways in each enterprise. The enterprise here is ACC, which is a continuing unit with organization and constitutes an entity separate and apart from the alleged pattern of racketeering.

153.    The pattern of racketeering involves acts which "are related" and "amount to or pose the threat of continued criminal activity." The acts as those "that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.  Here, specifically, Defendants' acts drain ACC of assets.

154. Defendants' past conduct by its nature projects into the future with a threat of repetition. The actual victims include many shareholders, employees and creditors of the many enterprises over at least a ten-year time period during which Defendants have participated in numerous enterprises,

155. The nature of Defendants' predicate acts are so serious, that enterprises do not typically survive the participation of Defendants. There are a great number of predicate acts complained of in this Complaint alone and Plaintiffs are informed and believe and thereon allege that there are many other predicate acts which have been undertaken by Defendants about which Plaintiffs do not know the specific facts at this time and cannot be expected to know those facts.

156. Plaintiffs and ACC were each injured in their business and property by Defendants' violations of §1962(c) and incurred the damages alleged above.

## NINTEENTH CAUSE OF ACTION

## RICO VIOLATIONS§ 1962(d) AGAINST ALL DEFENDANTS

157. The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

158. Plaintiffs seek remedies for Defendants' violations of 18 U.S.C. § 1962(d) which makes it unlawful to conspire to violate any of the previous three statutory subsections.

159. Defendants violated 18 U .C. § 1962(d) by conspiring to violate any of the previous three statutory subsections.

160. Plaintiffs and ACC were each injured in their business and property by Defendants' violations of §1962(d) and incurred the damages alleged above.

## TWENTIETH CAUSE OF ACTION

## FRAUD AGAINST ALL DEFENDANTS

161. The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

162. Each Defendant submitted requests for expense reimbursements to ACC on the actual and/or implied representation that the expenses were incurred in connection with ACC's business. Those representations were false when made including without limitation because

each Defendant submitted expense reimbursements to ACC for expenses which were not incurred in connection with ACC's business and/or submitted requests for expense reimbursement to ACC for expenses which were also submitted for reimbursement to other persons.

163.   Each Defendant also represented to ACC that they would each perform specific work when in fact such representations were false when made including without limitation because they each had no such intention.

164.   Each Defendant also actually and impliedly represented to ACC that they each had the ability to perform specific work when in fact such representations were false when made including without limitation because they each had no such ability.

165.   Defendants also actually and impliedly represented to ACC that they would each act on written budgets when in fact such representations were false when made including without limitation because they each had no such intention and caused ACC to prepare numerous budgets which they each then ignored.

166.   Defendants actually and impliedly represented to ACC that MISLE would follow up with various opportunities which were presented to ACC and with respect to following up on his responsibilities to ACC when in fact such representations were false when made including without limitation because MISLE had no intention of following up on those opportunities and ACC missed important opportunities.

167.   As a direct and proximate result and consequence of Defendants' wrongdoing as set forth herein, ACC has sustained and incurred general, special, consequential, incidental, compensatory, resulting, proximate, and nominal damages and will continue to sustain and incur such damages in the future, in exact amounts that are presently not known to Plaintiffs, but which exceed the minimum jurisdictional amount.

168.   ACC is entitled to an accounting from each Defendant.

169.   Punitive damages are available against each Defendant based on their fraud, malice and/or oppression.

170.   Plaintiffs are entitled to prejudgment interest at the maximum rate permitted by

law and compounded in the maximum manner permitted by law in light of Defendants' breaches of fiduciary duty.

**TWENTY-FIRST CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION AGAINST ALL DEFENDANTS**

171.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

172.    Each Defendant submitted requests for expense reimbursements to ACC on the actual and/or implied representation that the expenses were incurred in connection with ACC's business.  Those representations were false when made including without limitation because each Defendant submitted expense reimbursements to ACC for expenses which were not incurred in connection with ACC's business and/or submitted requests for expense reimbursement to ACC for expenses which were also submitted for reimbursement to other persons.

173.    Each Defendant also represented to ACC that they would each perform specific work when in fact such representations were false when made including without limitation because they each had no reasonable basis to make such statements.

174.    Each Defendant also actually and impliedly represented to ACC that they each had the ability to perform specific work when in fact Defendants had no reasonable basis such statements and such representations were false when made including without limitation because they each had no such ability.

175.    Defendants also actually and impliedly represented to ACC that they would each act on written budgets when in fact Defendants had no reasonable basis such statements and such representations were false when made including without limitation because they each had no such intention and caused ACC to prepare numerous budgets which they each then ignored.

176.    Defendants actually and impliedly represented to ACC that Defendants would follow up with various opportunities which were presented to ACC and with respect to following up on his responsibilities to ACC when in fact Defendants had no reasonable basis such statements and such representations were false when made including without limitation because

-52-

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

1  Defendants had no intention of following up on those opportunities and ACC missed important
2  opportunities.

3      177.   ACC incurred damages as a proximate result of Defendants' misrepresentations
4  and is entitled to damages, including punitive damages, as alleged above.

5      178.   Defendants each had no reasonable basis to make the representations which were
6  false when made.

7      179.   Defendants each knew and expected that ACC would rely on their
8  representations.

9      180.   ACC actually and justifiably relied on Defendants' representations.

10      181.   As a direct and proximate result and consequence of Defendants' wrongdoing as
11  set forth herein, ACC has sustained and incurred general, special, consequential, incidental,
12  compensatory, resulting, proximate, and nominal damages and will continue to sustain and incur
13  such damages in the future, in exact amounts that are presently not known to Plaintiffs, but
14  which exceed the minimum jurisdictional amount.

15      182.   ACC is entitled to an accounting from each Defendant.

16      183.   Punitive damages are available against each Defendant based on their fraud,
17  malice and/or oppression.

18      184.   Plaintiffs are entitled to prejudgment interest at the maximum rate permitted by
19  law and compounded in the maximum manner permitted by law in light of Defendants' breaches
20  of fiduciary duty.

21                **TWENTY-SECOND CAUSE OF ACTION**
22                **NEGLIGENCE AGAINST ALL DEFENDANTS**

23      185.   The allegations of the previous paragraphs are re-alleged and incorporated here by
24  this reference.

25      186.   Each Defendant was paid by ACC for work they claimed that he performed on
26  behalf of ACC, which relied on each Defendant to perform that work.

27      187.   Each Defendant also acted on behalf of MISLE, who was (and still is) an officer
28  and/or director of ACC.

188.    Each Defendant had duties to ACC including a duty to exercise reasonable care as to the actions which they undertook on behalf of ACC and decisions which each Defendant made for the benefit of ACC and a duty of loyalty to ACC.

189.    Each Defendant breached its duty of loyalty by acting in a manner which was contrary to ACC's best interests and its duty to exercise reasonable care.

190.    Each Defendant negligently submitted requests for expense reimbursements for expenses which were incurred in connection with ACC's business and/or submitted requests for expense reimbursement to ACC for expenses which were also submitted for reimbursement to other persons.

191.    Each Defendant failed to perform specific work which they undertook and/or for which they were paid including without limitation, failed to review, respond and/or act on written budgets when submitted to him, to remember important matters and to present certain matters to MISLE for "approval."

## TWENTY-THIRD CAUSE OF ACTION

## CANCELLATION OF STOCK AGAINST ALL DEFENDANTS

192.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

193.    Defendants wrongfully acquired ACC stock.

194.    Defendants' acquisition of ACC stock is void and/or voidable for fraud, duress, abuse of position, breach of fiduciary duty, unconscionability, absence of a meeting of the minds, absence of contractual intent, mistake, lack of consideration, failure of consideration and/or other grounds and/or each Defendant must return to ACC all of the consideration and/or benefits received by each Defendant from each such subsequent disposition of ACC stock and/or must compensate ACC for any excess consideration given by ACC beyond the fair market value of whatever ACC received for the stock sold by Defendants.

## TWENTY-FOURTH CAUSE OF ACTION

## RESCISSION AND/OR REFORMATION OF STOCK PURCHASE AGREEMENT

195.    The allegations of the previous paragraphs are re-alleged and incorporated here by

1    this reference.

2        196.   Defendants were fiduciaries who owed fiduciary duties to fellow ACC

3    shareholders and to ACC itself.

4        197.   Defendants breached their duties to ACC shareholders, have engaged in derelict

5    acts that has caused ACC to be mismanaged.

6        198.   Plaintiffs seek to set aside the transactions described in the Stock Purchase

7    Agreement together with related damages, interest and attorneys' fees.

8                        **TWENTY-FIFTH CAUSE OF ACTION**

9            **DISGORGEMENT OF PROCEEDS AGAINST ALL DEFENDANTS**

10       199.   The allegations of the previous paragraphs are re-alleged and incorporated here by

11   this reference.

12       200.   At all relevant times, Defendants were fiduciaries who owed fiduciary duties to

13   fellow ACC shareholders and to ACC itself.

14       201.   Defendants bought ACC's common stock from ACC.

15       202.   ACC paid the expenses for marketing ACC's stock and Defendants took for

16   themselves the benefits of those marketing efforts.

17       203.   As ACC's agent, Defendants learned of opportunities to sell Defendants'

18   inventories of ACC stock to third parties.

19       204.   Defendants sold Defendants' inventories of ACC shares to third parties, and

20   disregarded Defendants' obligations to ACC including Defendants' obligations not to usurp

21   ACC's corporate opportunities.

22       205.   Each of the stock sales involving any Defendant is void and/or voidable for fraud,

23   duress, abuse of position, breach of fiduciary duty, unconscionability, absence of a meeting of

24   the minds, absence of contractual intent, mistake, lack or failure of consideration, and/or other

25   grounds.

26       206.   Defendants must return to ACC all of the consideration and/or benefits received

27   by Defendants from each such sales.

28       207.   Defendants realized substantial monies including profits from the sales of ACC

1    shares and should be required to disgorge those monies to ACC, together with interest and

2    attorneys' fees.

3                        **TWENTY-SIXTH CAUSE OF ACTION**

4            **RESCISSION OF STOCK SALES AGAINST EACH DEFENDANT**

5            208.    The allegations of the previous paragraphs are re-alleged and incorporated here by

6    this reference.

7            209.    Defendants are now, and at all relevant times were, fiduciaries who owed

8    fiduciary duties to fellow ACC shareholders and to ACC itself. ·

9            210.    ACC paid the expenses for marketing the sale of ACCO's stock.

10           211.    Defendants bought ACC's common stock from ACC itself at little to no

11   consideration

12           212.    Defendants kept the money raised from sales of ACC stock.

13           213.    ACC paid the expenses for marketing ACC's stock and Defendants took for

14   themselves the benefits of those marketing efforts.

15           214.    Each of the sales involving any Defendant is void and/or voidable for fraud,

16   duress; abuse of position, breach of fiduciary duty, unconscionability, absence of a meeting of

17   the minds; absence of contractual intent, mistake, lack of consideration, failure of consideration

18   and/or other grounds and/or each such stock sale should be set aside together with all other

19   amounts to which ACC is entitled, including interest and attorneys' fees.

20                      **TWENTY-SEVENTH CAUSE OF ACTION**

21   **REMOVAL OF MISLE AS DIRECTOR, OFFICER AND/OR MANAGER OF ACC, AND**

22        **REMOVAL OF RADUSCH AS CHIEF FINANCIAL OFFICER OF ACC**

23           215.    The allegations of the previous paragraphs are re-alleged and incorporated here by

24   this reference.

25           216.    Plaintiffs constitute about forty percent (40%) of the outstanding shares of ACC.

26           217.    The above facts show that MISLE should be removed as a director, officer and/or

27   manager of ACC, and RADUSCH should be removed as Chief Financial Officer of ACC,

28   pursuant to applicable law, including, without limitation, Corporations Code section 304.

**INDIVIDUAL CLAIMS BY PLAINTIFFS**

**TWENTY-EIGHTH CAUSE OF ACTION**

**FRAUD AND CONCEALMENT UNDER CALIFORNIA CIVIL CODE SECTION 1710**

**BY PLAINTIFFS INDIVIDUALLY AGAINST ACC AND MISLE**

218.    The allegations of the previous paragraphs are re-alleged and incorporated here by this reference.

219.    Prior to the time that Plaintiffs purchased shares in ACC, MISLE represented that ACC was a well-managed company that was highly successful and well-funded.   MISLE encouraged Plaintiffs to invest a significant amount of money into ACC. These representations were in fact false, as explained herein. When MISLE made these representations, he knew them to be false, and made these representations with the intent to defraud and deceive Plaintiffs and with intent to induce Plaintiffs to purchase shares in ACC.

220.    Prior to the time that Plaintiffs purchased shares in ACC, MISLE and ACC intentionally concealed from Plaintiffs all of the wrongful and fraudulent acts that are alleged herein, even though MISLE was a personal friend of Plaintiffs and knew that Plaintiffs trusted MISLE's representations. Plaintiffs were ignorant of the information that was concealed and suppressed by MISLE and ACC.   MISLE and ACC concealed suppressed this information with the intent to defraud and deceive Plaintiffs and with the intent to induce Plaintiffs into purchasing shares in ACC.

221.    The aforementioned fraudulent acts by MISLE and ACC are despicable conduct that subjected Plaintiffs to cruel and unjust hardship done in conscious disregard of their rights. MISLE and ACC were aware of the probable consequences of their conduct and willfully and deliberately failed to avoid those consequences. Therefore, the conduct of MISLE and ACC constitutes oppression, malice, and fraud under Civil Code §3294, entitling Plaintiffs to punitive damages.

///

/// .

///

# PRAYER

WHEREFORE, Plaintiffs pray for judgment awarding the following against Defendants and in favor of Plaintiffs and ACC:

·    1.    General, special, compensatory and consequential damages according to proof against Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein.

2.    All available equitable, legal and related remedies against Defendants, jointly and severally.

3.    Prejudgment interest on damages.

4.    Attorney's fees and expenses.

5.    Costs of suit incurred. ·

6.    Punitive damages and/or treble damages according to proof.

7.    Accounting of all funds· paid to or by ACC, all sales by Defendants, all dispositions of any kind of ACC assets and all contracts between ACC and any other person.

8.    Injunctive relief:

a.    Defendants should be: (1) required to books and records of ACC for Plaintiffs' inspection and/or copying; (2)prohibited fron1 interfering with the production of books and records of ACC for Plaintiffs' inspection and/or copying; (3) required to protect and maintain ACC's books and records; (4) prohibited from destroying any books and records of ACC; and (5) required to report to and account to this Court, under oath, as to compliance with the Court's requirements

b.    Defendants should be prohibited from buying and/or selling any ACC shares without prior approval of this Court or until further Court Order and should be required to report to and account to this Court, under oath, as to compliance with the Court's requirements.

c.    Defendants should be prohibited from taking any corporate action on behalf of ACC without full disclosure to all shareholders and to this Court.

d.    Defendants should be prohibited from transferring any property without prior approval of this Court.

e.      Defendants should be prohibited from investing in ACC without prior approval of this Court and should be required to report to and account to this Court, under oath, as to any loans or other investment in ACC.

f.      Defendants should be prohibited from pursuing any opportunity which properly belongs to ACC, and should be prohibited from doing so either individually or with or through any other person, without prior approval of this Court and should be required to report to and account to this Court, under oath, as to any business and/or investment opportunities which Defendants pursue.

g.      Defendants should be prohibited from pursuing any transaction with ACC, and should be prohibited from doing so individually or with or through any other person, without prior approval of this Court and should be required to report to and account to this Court, under oath, as to any business and/or investment transactions with ACC, and as a prerequisite for any Court approval, Defendants should be required to obtain an independent appraisal of the transaction.

h.      Defendants should be held accountable for any violation of any orders of this Court.

9.      Disgorgement from each Defendant of all ill-gotten gains, profits, benefits, and other compensation obtained by Defendants as a result of the acts and transactions complained of herein.

10.     Restitution from each Defendants of all assets taken from ACC whether or not pursuant to contract and whether or not received in exchange for consideration.

11.     Rescission of all stock sales involving any Defendant.

12.     Cancellation and/or reformation of all contracts entered into between any Defendant and ACC.

13.     Recording or allowing the recording of an equitable lien and/or a constructive trust on assets of Defendants.

14.     Costs and disbursements for appraisers, accountants and other experts and professionals including without limitation, with respect to valuation and inspection of ACC's books and records.

15.     Appointing a receiver and/or keeper for ACC to maintain and protect all of the assets, receivables, payables, books and records of ACC.

16.     Such other relief as the Court deems just and proper.

Dated: June 11, 2019                           GAREEB LAW GROUP APC



By: _____
          Alexander S. Gareeb, Esq.
          Ronald Minassian, Esq.
          Attorneys for Plaintiffs
          PETER SELTZER, ALEXANDER S. GAREEB, and
          BASHIR HAJJAR

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF